## STATE v. DONNIE E. JOHNSON.

(Filed 28 February, 1962.)

**1. Criminal Law § 5—**

Defendant's mental incapacity to know the nature and quality of his acts or incapacity to distinguish between right and wrong is a defense to a charge of crime.

**2. Criminal Law § 62—**

An expert may testify from his personal observation and examination of defendant over a considerable period of time as to his opinion that, although defendant in general knew the difference between right and wrong, defendant for some specific event or thing could not distinguish right from wrong and could not do so at the time he was admitted to the hospital for observation about 16 days after the alleged homicide,

since such testimony would reasonably permit a jury to make an inference of insanity at the time of the commission of the offense charged.

WINBORNE, C.J., not sitting.

APPEAL by defendant from *Bone, J.,* September 1961 Term of CRAVEN.

Criminal prosecution upon an indictment charging that defendant on 1 September 1960 "feloniously, wilfully, and of his malice aforethought, did kill and murder Thelma M. Johnson." G.S. 15-144.

Plea: Not Guilty. Verdict: Guilty of second degree murder.

From a judgment of imprisonment, defendant appeals.

*Attorney General T. W. Bruton and Assistant Attorney General G. A. Jones, Jr., for the State.*

*Charles L. Abernethy, Jr., for the defendant.*

PARKER, J.  The State's evidence tends to show the following facts:

Thelma M. Johnson was defendant's wife. Three or four weeks before 1 September 1960 defendant said that he was going to kill her just as sure as she is living. On 1 September 1960 just a very brief time before he began hitting and stabbing his wife with a knife in the city of New Bern he said "I'll slow walk her." Shortly thereafter he beat and stabbed his wife with a knife. His wife was carried to a local hospital, and died there the next day as a result of a stab wound in her right chest inflicted by defendant with a knife.

The principal defense relied on by defendant is that he lacked mental capacity to commit a crime. He testified in part in substance: While he was in the U. S. Marine Corps, he fell and fractured the back of his skull. Since then he has had tremendous headaches. Sometimes he is himself, and sometimes he is not. Sometimes his mind "gets in a tense," and he doesn't know what he has been doing or saying. They say he killed his wife on 1 September 1960; he doesn't know. He will not say he didn't kill her; he may have. He doesn't know anything about it. He got out of the Marine Corps in 1950, 1958 or 1959. The Marine Corps released him, and he gets $84 a month. He remembers going to a hospital at Camp Lejeune, and the naval hospital at Portsmouth, Virginia.

The record shows that Judge Burgwyn presiding over the September Term 1960 of Craven County Superior Court entered an order committing defendant to the state hospital for the insane at Goldsboro, by virtue of G.S. 122-91. The record further shows that Judge Morris presiding over the November 1960 term of said court entered an order extending the time of defendant's commitment to the said state hos-

pital for the insane at Goldsboro, because it appeared to the court that more time is needed for the medical authorities there to examine and observe defendant.

During the trial Dr. Norman Bruce Kyles, a psychiatrist practicing at the state hospital for the insane in Goldsboro, now called Cherry Hospital, was sworn as a witness for defendant. Dr. Kyles testified in substance: Under court orders he examined defendant from 16 September 1960 until 6 January 1961, and from 30 January 1961 until 18 July 1961. His examinations consisted of interviews with defendant. He examined his case history. He was then asked by one of defendant's counsel, "And what did that case history consist of?" The solicitor for the state objected, and the judge had the jury to retire to the jury room.

Whereupon, in the absence of the jury, Dr. Kyles was asked many questions by one of defendant's counsel, and gave many answers, which appear in the record pp. 29-42, both inclusive. This is a summary of some of his testimony given in the absence of the jury:

His examination was a mental examination requiring answers; not a physical examination. During his interviews with defendant he observed that defendant's manner showed a degree of depression, that we call apathy, and not too much concern with the situation he was in. Some deficiency of intellectual functioning; memory defect and lack of it; in general, confusion as to his whole situation, where he was and the purpose of his being there. He found evidence of brain deterioration caused, in his opinion, by actual tissue damage of some nature. From his examination of defendant he formed the opinion that he could have done an act, and not be fully aware that it was an act that was right or wrong. He formed the opinion that in general defendant would know the difference between right and wrong, but that for some specific event or thing he could not fully distinguish between right and wrong. Defendant excepted to the exclusion of this testimony from the jury.

During the lengthy examination of Dr. Kyles by one of defendant's counsel in the absence of the jury, he was asked many incompetent questions. During this examination the court asked Dr. Kyles this question: "Let me ask him something while you are thinking of something else there. Doctor, leaving out the record from the naval hospital that you had, do you have an opinion satisfactory to yourself, based upon your observation of the defendant, your examination of him and such observation and examinations as was made of him at the institution to which you're assistant superintendent and which were part, made as a part of the record of that institution, now based upon those things and leaving out the record, do you have an opinion — satisfactory to

yourself as to whether or not the defendant had sufficient mental capacity to distinguish right and wrong on, I believe the date he was admitted, September 16, 1960?" To which Dr. Kyles replied: "Yes sir, may I qualify that. I do believe that he had the ability at that time to distinguish in general right from wrong."

When one of defendant's counsel at the end of his long examination of Dr. Kyles in the jury's absence said that is all, the court said: "There'll be no necessity to repeat it in the presence of the jury because I have excluded everything that is important to the defendant. I'm going to sustain the objections to it and exclude all of it." Naturally under those circumstances the State did not cross-examine Dr. Kyles.

The Court said in *S. v. Swink*, 229 N.C. 123, 47 S.E. 2d 852:

> "It is a well settled rule in the administration of criminal justice in this State that an accused is legally insane and exempt from criminal responsibility by reason thereof if he commits an act which would otherwise be punishable as a crime, and at the time of so doing is laboring under such a defect of reason, from disease of the mind, as to be incapable of knowing the nature and quality of the act he is doing, or, if he does know this, incapable of distinguishing between right and wrong in relation to such act."

See also *S. v. Bracy*, 215 N.C. 248, 1 S.E. 2d 891, to the same effect.

Dr. Kyles, a psychiatrist at the state hospital for the insane, who under court orders had observed and examined defendant for a considerable period of time, beginning within some sixteen days after the commission of the alleged offense, and had a reasonable opportunity of forming an opinion satisfactory to himself as to his mental condition, was qualified to express an opinion as to his sanity or his ability to understand the difference between right and wrong, and should have been permitted by the court to give his opinion in respect thereto in evidence before the jury. *S. v. Matthews*, 226 N.C. 639, 39 S.E. 2d 819; *S. v. Hawkins*, 214 N.C. 326, 333, 199 S.E. 284, 288; *S. v. Nall*, 211 N.C. 61, 188 S.E. 637; *S. v. Keaton*, 205 N.C. 607, 172 S.E. 179; *S. v. Jones*, 203 N.C. 374, 166 S.E. 163.

The judge excluded from the jury testimony of Dr. Kyles summarized above, which was relevant, both as to time and matter, and material on the issue of defendant's mental condition at the time of the offense charged, which could reasonably permit a jury to make an inference of insanity of the defendant at the time of the commission of

the offense charged in the indictment, and this constitutes prejudicial error entitling defendant to a new trial, and it is so ordered.

New trial.

WINBORNE, C.J., not sitting.