Cecil **LOVEDAHL**, Petitioner,

v.

**STATE OF NORTH CAROLINA,**
Respondent.

Civ. No. 1478.

United States District Court
E. D. North Carolina,
Raleigh Division.

June 30, 1965.

John R. Jordan, Jr., of Jordan & Toms,
Raleigh, N. C., for petitioner.

T. Wade Bruton, Atty. Gen., of N. C. by Theodore C. Brown, Jr., and Andrew A. Vanore, Jr., Staff Attorneys, Raleigh, N. C., for respondent.

LARKINS, District Judge:

## SUMMARY

This cause comes before the Court upon a petition for a writ of habeas corpus filed by a State prisoner, pursuant to Title 28 U.S.C.A. § 2254. Issues were originally joined when the respondent, the State of North Carolina, answered the petition and moved to dismiss.

This petition, now being considered, is the last of a series of petitions for writs of habeas corpus which have been filed in both State and Federal Courts. Petitioner has now filed four petitions in this Court, and twelve in the State courts. This last petition now before the Court, was denied without a hearing on January 7, 1964, and petitioner appealed to the United States Court of Appeals for the Fourth Circuit, and that Court vacated the order of denial and remanded the cause for further proceedings in accordance with its Opinion (Lovedahl v. State of North Carolina, 338 F.2d 512 (4th Cir., 1965).

Pursuant to the provisions of the Judgment in lieu of mandate of the Court of Appeals for the Fourth Circuit in Lovedahl v. State of North Carolina, supra, this Court ordered a hearing to be held to take complete evidence on the question of the mental competency of the petitioner at the time of his trial in October 1946, and at the time of the commission of the crime on August 22, 1946.

The Court appointed counsel to assist petitioner, whereupon a plenary hearing was held on the mental competency of petitioner, said hearing being held on April 30, 1965 at Raleigh, North Carolina.

## FINDINGS OF FACT

The petitioner was incarcerated in the State Prison System under a sentence of life imprisonment. The judgment was rendered in the Superior Court of Jackson County, October 1946, State v. Cecil Lovedahl, No. 2236, October 9, 1946.

The record discloses that the sentence was rendered upon a plea of guilty of accessory before the fact of murder in the first degree. No evidence was offered, but the sentencing court included in its judgment; "[t]hat the defendant be examined by the State Prison authorities and his mental and physical condition given such treatment as might be necessary."

The plea of guilty was entered by petitioner's privately retained counsel, E. P. Stillwell, now deceased, counsel having been retained by petitioner's parents. Present in the conferences between petitioner and his counsel were petitioner's parents, an old family friend, Hute Moffitt, and counsel from the Veterans' Administration.

 Petitioner is now a State parolee and is under the supervision and custody of the medical authorities at Dorothea Dix Hospital, a State institution in Raleigh, North Carolina. An explicit condition of the parole from prison to this institution is that petitioner is not to be released from the custody of the hospital without the permission of the Board of Paroles. Petitioner is, therefore, under significant restraint as a result of his original judgment, thereby having standing to pursue a writ of habeas corpus.

Prior to enlisting in the United States Army in 1942, petitioner lived at home with his parents where he was reared as an only child in a rural farming environment. He was actually the last of four children but the older three children died at early ages.

Petitioner's father did not exercise significant parental control over petitioner, therefore, this duty fell on his mother. He admits being given to temper tantrums to get his own way. He does not show any significant parental resentment, however, although he does indicate a greater preference for his father.

He was known as a good boy in the local community prior to his entering the Army, but he was not a good student and dropped out of school before finishing the eighth grade.

At the age of sixteen he enlisted in the Army by lying about his age. While in training in the United States, petitioner received only one short period of "Company Punishment" for being absent without leave for a short period. Petitioner was sent to North Africa and was again absent without leave, this time for three days, causing him to miss contact with his unit as it was being transferred to England. This, in turn, caused him to be detained in North Africa for some three months before being rejoined with his unit in England.

During this three months detention the military authorities were advised by petitioner's mother that he was an underage enlistee. It was determined to return him to the United States in January 1944. While awaiting this return to the United States, he began smoking and drinking in excess. On the evening of January 20, 1944, while under the influence of alcohol, petitioner shot himself in the left shoulder while attempting a suicide. This was the first of some eighteen attempts at suicide. He recovered completely from this first attempt.

On October 27, 1944, it was determined that the injury sustained by the petitioner was in the line of duty in that he was "mentally deranged" at the time the injury occurred.[1]

Upon petitioner's return to the United States, and upon his discharge, he began a series of travels throughout the country. During this period he was nervous and restless and continued his excessive drinking habits. He drifted from Maryland to Mississippi and finally, by the spring of 1946, to the State of Washington. While in Washington, petitioner stole the automobile of his employer and drove it to St. Louis, Missouri, where he sold the car and used the proceeds to return to the home of his parents in Jackson County, North Carolina.

His general conduct did not improve upon his return and he continued in his restless and drinking ways getting into trouble whenever under the influence of alcohol. When sober, however, petitioner was friendly and easy to get along with.

After arriving in Jackson County, he was arrested for the theft of the automobile in the State of Washington, the actual arrest taking place in neighboring Haywood County, North Carolina. One Cecil Shular went to Haywood County and provided the bond of $1,500. in order to obtain the release of petitioner from jail.

During this period petitioner was associating with a group of veterans in Jackson County who had organized for

[1] MEMORANDUM—United States Government, October 27, 1944
"TO: File
FROM: Authorization Unit
SUBJECT: LOVEDAHL, Cecil J.
 C–4 256 665

LINE OF DUTY DECISION—R & PR—1075

"FACTS: Records disclose that this veteran was honorably discharged on May 23, 1944. He suffers from a disability of injury to left chest, incurred * * * under the following circumstances:
The veteran upon being informed that he was to be returned to the United States and discharged from the military service by reason of minority became mentally deranged and apparently attempted to commit suicide. Veteran was at his post on full duty.
"QUESTION: Misconduct and line of duty status.
"DECISION: The report of the Investigating Officer is concurred in and it is the decision of the Authorization Unit that the injury sustained by the veteran was not the result of his own misconduct and was incurred in line of duty. This decision is based on all evidence of record * * *."

the purpose of electing a new slate of county officials composed of these self-same veterans. These veterans met from time to time in a local sand pit or rock quarry known as the "hole." While meeting, these men would drink, and petitioner, who was not yet twenty years old, would drink with them, and in excess. On one such occasion, shortly before the day of the alleged crime, he proposed to kill certain of the officials then in office in Jackson County. He included as a tentative victim, the Chief of Police of the Town of Sylva, R. Don Davis, who has since died. Petitioner stated that he was going to "kill all the law."

The day of the offense, August 22, 1946, petitioner went into the Town of Sylva from where he lived, some short distance out of the town and in the county. It was before noontime, and petitioner bought a pint of whiskey and some "rubbing alcohol." While there making these purchases he met Police Officer Davis. A verbal exchange resulted from this meeting, but the content of it is not in evidence.

The evidence next indicates that by that afternoon petitioner was highly intoxicated from consuming all the whiskey and "rubbing alcohol." It is in evidence that petitioner was now causing trouble, apparently as a result of his drinking. He had threatened the life of his father, whom he stated he had killed, and both parents were in hiding, fearing for their lives. Petitioner was armed with a rifle and was brandishing the weapon about in this drunken state. He shot his pet dog and then stabbed it. Petitioner was not so drunk however as to permit anyone in his presence to get close enough to him to disarm him. He was constantly aware of his surroundings, and as to who was present. He was alert enough to control those in his presence.

While this was going on, Cecil Shular, petitioner's friend, drove up in his car in which there were some four or five passengers, as well as the mail. Shular served as the local taxi or bus service, and also as the local rural mail carrier. Shular stopped to persuade petitioner to

put up the gun, telling petitioner that he was drunk, but the petitioner refused to do so. He stated to Shular that he was going into town to "face Davis."

During the course of this conversation, Shular's car was driven away where some of the passengers were discharged. The car was then driven back and as it approached Shular and petitioner, petitioner stopped it by brandishing his rifle, he "held up" the car and then made all the passengers get out as well as the driver.

Petitioner then testified that he got in the back seat while he made Shular get in the front seat in order to drive him to Sylva. Petitioner stated that he could not get in the front seat because packages were in the front. He got in the back and placed the rifle in his lap. The car then drove off toward Sylva, proceeding about a mile down the road when the car suddenly swerved into a ditch.

Petitioner testified that the car ran into the ditch causing the rifle to fire, the bullet to penetrate the rear of the front seat in which Shular was sitting, and then into the body of Shular. There is evidence to indicate that the shot was fired prior to the time the car ran into the ditch. This evidence comes from two men who were working in a nearby field, Oscar and Wayne Lovedahl, and these two men ran over to the car as it sat in the ditch. Shular told these two that Cecil Lovedahl had shot him and he "did not know why." Shular died the following day as a result of the bullet wound.

Immediately after the shooting, Wayne Lovedahl tried to drive the Shular car out of the ditch while Oscar Lovedahl and petitioner attempted to push it out. It is important to note that petitioner had presence of mind and body enough to assist in the attempted moving of the car although he was still intoxicated.

Petitioner then left the scene and later appeared at the home of Hute Moffitt, who was the elderly patriarch of the community, and had befriended petitioner. While at the Moffitt home, petitioner told all

that he had done. He stated, "Uncle Hute, I want you to pray for me, I am in a terrible fix, I killed my Daddy, and Cecil Shular and my dog." This statement was made while petitioner was still under the influence of alcohol. As Mr. Hute Moffitt stated, "I believe the boy had the drunken tremons, * * * he was wild."

Petitioner was arrested shortly after this statement was made and Police Chief Davis assisted in the arrest. He testified that upon making the arrest petitioner stated, "I aimed to do it and I am not sorry, and if it was to do over I would do the same thing again." There is no corroborative evidence of this statement although two other officers assisted in the arrest.

Petitioner was tried and sentenced on Wednesday, October 9, 1946, a considerable time after court had convened. His attorney was retained by petitioner's father about a week after the crime occurred, or more than a month prior to trial. Petitioner and counsel first conferred at that time. Counsel also wrote the Veterans' Administration seeking petitioner's military record, being of the opinion that it might be of some assistance in the defense of petitioner.

The Veterans' Administration responded by not only sending the military records as requested, but by also sending a Veterans' Administration attorney, Mr. Lamar Galloway, who was stationed at that time in Asheville, North Carolina.

The record does not indicate if, or to what extent petitioner's counsel investigated the crime between the time he originally conferred with petitioner and the time petitioner was first called to trial on Monday, October 7, 1946. It does appear that some form of investigation was undertaken, however, and that counsel was unable to obtain favorable testimony on petitioner's behalf.

Attorneys Stillwell and Galloway conferred and it was their considered opinion that a plea was the best course to take in order to most effectively serve the interests of petitioner. It was their hope to persuade the Solicitor, John M. Queen, and the private prosecutor, Dan K. Moore, to agree to a plea of second-degree murder, but the prosecution would not consent to this course of the trial.

During the process of these negotiations, counsel was also conferring with petitioner and his father in the presence of petitioner's mother and Hute Moffitt. These two, petitioner and his father, were never able to agree on what course to take, each changing his mind in opposition to whatever decision the other would take—these changes being very frequent. As Attorney Stillwell stated in his testimony at a prior habeas corpus hearing held before this Court, Judge Don C. Gillam presiding (Lovedahl v. K. B. Bailey et al., Raleigh Division, 1954):

"Q At any rate, Mr. Stillwell, if you talked to Cecil Lovedahl prior to October 7, 1946, each and every time he advised you that he was not guilty of the crime?

"A He never did tell me he was not guilty of anything.

"Q Well, did he tell you on Monday, October 7, 1946, or any time prior thereto that he wanted to plead guilty?

"A Well, we discussed it pro and con, as those things are. Now, what happened, I explained to him I thought he was not in good position to go to trial on first degree murder. I explained that to Cecil Lovedahl on Monday, Tuesday and Wednesday, in the presence of his parents, and in the presence of Mr. Lamar Galloway at most of the conferences. I explained to him after I had talked with Judge Nettles that Judge Nettles told me that if he was convicted of second degree murder, he would have to give him 30 years, and that if he submitted to accessory and was given a life sentence and made a good prisoner, that the probabilities were that he would not have to stay

in prison any longer on one plea than the other. I don't know the conferences we had that it was agreed for me to enter the plea of accessory. I am now inclined to believe that that was the agreement on Tuesday. Cecil Lovedahl agreed to it and his parents agreed to it. However, the next morning, on Wednesday, as I remember, either Cecil Lovedahl or his father, Elsie Lovedahl, had changed their minds and thought maybe we had better not submit. It seemed that during this three-day period, there was an entire change of opinion between Cecil Lovedahl and his father; one would agree that it was best to submit and the other would agree that may be they better not. But at the final conference just a few minutes before I entered the plea, it was agreed by Cecil Lovedahl and his parents, and in the presence of Mr. Lamar Galloway, that I enter the plea that appears in the record in this case, and but for such an agreement, I, of course, would not have entered such a plea. And Uncle Hute Moffitt was present at some of these conferences, as a friend to me and a friend to the Lovedahl family, and concurred that this course was probably the best thing that could be done for Cecil Lovedahl. And immediately after this agreement, we left the conference room in the Court House and went into the Court room and I tendered the plea to the Court, with all of the parties present around me that were in the conference on the outside in the conference room; and there was no objection at the time I made the plea in open Court, in their presence, and no one descented [sic] from it, and it was made in obedience to the agreement reached a few minutes before, as indicated above.

"Q You, of course, advised Cecil Lovedahl of your conference with Judge Nettles, in which he stated that if Cecil Lovedahl was convicted of murder in the first degree, he would have to give him 30 years in the State's Prison?

"A I so advised him.

"Q You likewise advised him, did you not, of your conversation with Judge Nettles that if he would plead guilty to accessory before the fact of murder in the first degree, and upon a sentence of life in the State's Prison, that if he behaved himself, that it would be recommended that he would get out much earlier than the 30-year sentence?

"A The contents of your question are not quite accurate, I advised Cecil Lovedahl in the presence of his parents, that Judge Nettles had indicated to me that if Cecil was convicted of second degree murder, he would give him 30 years in the penitentiary, and that on a plea of accessory before the fact to murder in the first degree, he would have to give him a sentence of life imprisonment; but that if he made a good prisoner, he, Cecil Lovedahl, would probably not have to remain in prison any longer on a plea of murder in the second degree than he would on a plea of accessory to murder in the first degree, and I explained as best I could to Cecil Lovedahl and his parents this situation as indicated to me by Judge Nettles.

\* \* \* \* \* \*

"Q When you talked to Cecil Lovedahl on Monday, October 7, 1946, he did not want to plead guilty to murder?

"A Well, I don't know about that now. It would be impossible for me to state now at what

particular conference he agreed that it would probably be best to enter the plea * * *.

"Q Did Cecil Lovedahl agree to plead guilty to anything on Tuesday, October 8, 1946?

"A It was my recollection that there was an agreement reached sometime during that day, for me to enter such a plea the next day."

As can be seen from this testimony of petitioner's trial counsel, given under cross-examination in petitioner's habeas corpus hearing held in 1954, petitioner was participating in the discussions, and his opinion was given great weight by all parties involved. He was in control of his trial although the opinion of his father was given considerable weight, and the father's opinion should have been given weight because petitioner was a minor. It appears, therefore, that prior to and during trial, petitioner's counsel did not consider him mentally incompetent to assist in his defense, because he did assist.

It is to be noted that in the Superior Court of Haywood County, North Carolina, January Term 1948, in the case of Mrs. Dorothy Shular v. Imperial Life Insurance Co., the widow of the deceased Cecil Shular, successfully pursued a civil action before a jury, and against the insurance carrier of the deceased, to recover benefits under a double indemnity clause for accidental death of the deceased. It was determined by the jury in this civil action that death was by accidental means. An important issue in the case was the proving that petitioner was highly intoxicated and incapable of making a clear and sane judgment as to his course of conduct at the time the rifle was fired, thereby resulting in the accidental death of Cecil Shular.

 The Court takes judicial notice of the fact that the civil action in 1948 is not controlling upon any criminal determination of mental ability to determine right from wrong, or as to the factual situation surrounding the commission of a crime.

It is necessary to examine petitioner's extensive psychiatric history to see how it relates to petitioner's personal history. This is so because most of the psychiatric history was developed after petitioner was imprisoned.

Shortly after petitioner's attempt at suicide on January 21, 1944, he was given a thorough physical and mental examination. The first of the mental examinations indicates, under date of February 12, 1944, U. S. Army, 79th Gen. Hosp., Clinical Abstract, that petitioner was "unpredictable," and it was feared that he might "make future attempts to harm himself."

Petitioner was again examined on March 4, 1944, and later on April 22, 1944, as well as on May 8, 1944. The result of these examinations was a determination that there were "no psychotic trends present." It was also determined to release petitioner from military service under "Section VIII," because "[h]e is a very immature and unstable individual who exercises poor judgment on occasions, and cannot be considered reliable."

On January 24, 1945, petitioner reported to the Veterans' Administration Out Patient Clinic, Oteen, North Carolina, and received an examination there. He was highly resentful of his "Section VIII" discharge, but it was determined, "the mental stream is absolutely normal. * * * Insight and judgment are both good."

The next mental examination petitioner obtained was by the prison authorities at Dorothea Dix Hospital after the crime had occurred. This was on October 23, 1946. From the date of January 24, 1945 to October 23, 1946, a period of some seventeen months, there was no determination as to petitioner's mental state. The record must therefore be examined in such a manner as to see if such a determination will show the substance of petitioner's contention.

In this regard, it is essential to note that petitioner was first admitted to Dorothea Dix Hospital as a patient in

1951. He was not determined psychotic at that time. It was not until his fifth admission to that institution in 1956 that he was diagnosed as psychotic, and in such a form as to impair his ability to determine right from wrong. This form of mental disorder from which petitioner was determined to suffer is such as to come and go, but not such a type as to last very short periods when a person is suffering from the malady.

With this in mind, it is necessary to note that the prison psychiatrist who examined petitioner on October 23, 1946 felt he was competent to stand trial at that time. He specifically testified that if petitioner was in the mental condition on either August 21 or October 9, as he was in at the time of the mental examination of October 23, 1946, then he was clearly competent.

The question then narrows down to whether petitioner's mental state had materially changed from the time of the crime up to October 23, 1946, or whether it had changed for reason of psychosis or alcohol.

On the day of petitioner's commitment to Central Prison in Raleigh, North Carolina, he was examined by a prison staff physician. This physician noted that petitioner was nervous but rational, and he testified that he was not outstanding in his mind. He was scheduled for a mental examination, however, because the judgment indicated one and because the physician thought one was necessary.

At the trial on October 9, 1946, and for the two days previous, petitioner's counsel, co-counsel, parents and family friend, Hute Moffitt, all consulted with him. They also had his military records before them. None of these persons appear to have considered him incompetent at that time.

The only evidence appearing which might tend to indicate incompetency at the time of trial, or at the time of the offense, comes from the affidavit of Mrs. Shular's attorney at the civil action of 1948, and from a letter written by Solicitor Queen in 1948, this letter being based on the transcript of the civil trial in 1948. If one is not careful in the reading of the letter of Solicitor Queen, dated September 11, 1948 and addressed to Governor R. Gregg Cherry, it might tend to indicate a belief that there was a lack of mental competency on the part of petitioner to commit a crime. But, in fact, the letter states that it is now the belief of Solicitor Queen that petitioner had a good defense to the offense of murder in the first degree by reason of his intoxication. This opinion of Solicitor Queen is based upon a reading of the transcript of the 1948 civil trial of Shular v. Insurance Company, supra.

The question then resolves itself to whether petitioner was so intoxicated at the time the crime occurred as to be unable to commit a crime at all. This question is clearly stated in the letter of the Superintendent of Dorothea Dix Hospital, addressed to this Court under date of January 21, 1965. It set out a brief history of petitioner's case, and then states:

"Based on the above outlined informations, it appears that he has not been diagnosed insane prior and after the commitment of the crime and that there is no evidence of insanity. There are notations in his record, that he was intoxicated when the fatal shooting occurred. It is impossible for us to express any opinion as to the degree of intoxication. Such opinion could be given only by a physician who had examined personally Cecil Lovedahl, at the time of his arrest."

■ Unfortunately, such an examination is not available, as they rarely are, but the Court is not to be foreclosed from making a determination without it. It does have evidence as to petitioner's conduct at the time, and this has been set forth in detail. Evidence as to this petitioner's alertness to keep anyone from getting to close to him, his statement to Hute Moffitt which shows an appreciation of some of the things he had done, although it also indicates that he was confused, the fact that petitioner was able to keep on his feet and threaten

those about him, wave the car down and help in the attempt to push it from the ditch, all indicate some rational conduct on his part.

From all this evidence indicating the ability to determine right from wrong, as well as from the testimony of petitioner himself as to his clear recollection of minute details of the day the offense occurred, it appears that petitioner has failed to carry his burden of showing mental incapacity to determine right from wrong at the time the offense occurred, or to assist his counsel in the preparation of an adequate defense. This conclusion is especially clear when it is considered in light of the expert testimony and medical evidence presented, including the psychiatric opinion that the ability to recall the events leading up to the crime in detail is extraordinary for one in a mentally incapacitated state.

## CONCLUSIONS OF LAW

■■ This Court is controlled by the State of North Carolina's test of insanity at the time of the offense and at the time of petitioner's trial unless such test so flagrantly violates Federal Constitutional standards that it amounts to a denial of due process of law or equal protection of the laws. Geaminea v. Nebraska, 206 F.Supp. 308 (D.C.Neb., 1962). The use of habeas corpus in this Court, from State prisoners, is confined to inquiries into federal constitutional violations. Adamson v. Nash, 218 F. Supp. 841 (W.D.Mo., 1963); and United States ex rel. Martin v. Murphy, 208 F. Supp. 562 (N.D.N.Y., 1962) affirmed in 319 F.2d 897 (2nd Cir., 1963).

Therefore, this Court has examined the evidence to determine if the North Carolina test of mental responsibility was violated in such a manner as to deny petitioner his rights protected by the Federal Constitution.

■ In North Carolina, the test of mental competency is the capacity of an accused to distinguish between right and wrong at the time and in respect to the matter involved. State v. Scales, 242 N. C. 400, 87 S.E.2d 916 (1955); State v.

Willis, 255 N.C. 473, 121 S.E.2d 854 (1961); and State v. Johnson, 256 N.C. 449, 124 S.E.2d 126 (1962).

■ As to mental capacity as affected by intoxicating beverages, in North Carolina the accused must show that he was intoxicated to such an extent that he did not know what he was doing, or trying to do, and was incapable of forming a criminal intent. State v. Hairston, 222 N.C. 455, 23 S.E.2d 885 (1943). In conjunction with the above rule, it is to be recalled that every man is presumed sane. State v. Creech, 229 N.C. 662, 51 S.E.2d 348 (1949).

■ In a habeas corpus petition from a State proceeding to the Federal Court, it is also incumbent upon the petitioner to show, by a preponderance of the evidence, that he was not capable of forming the requisite criminal intent at the time of the offense—according to North Carolina standards—and he has failed to carry this burden. Beeler v. Crouse, 332 F.2d 783 (10th Cir., 1964); and Hall v. Warden, 313 F.2d 483 (4th Cir., 1963).

The facts indicate that the petitioner did know what he was doing when he got in the Shular car. At that time he had formed a criminal intent. It is also clear that he had control of his faculties in order to be able to discern right from wrong. This was demonstrated by his ability to keep people from getting close enough to him to disarm him, by his excellent recall of the events, by his statements at the time and, later that day, to "Uncle" Hute Moffitt. These conclusions are supported and confirmed by the expert testimony taken at petitioner's hearing, and by the related medical records admitted into evidence.

■ The Court also notes that there is no indication on this record to cause the Court to question the constitutionality of the North Carolina test of mental incompetency by reason of insanity or intoxication in a criminal proceeding. They do not appear contrary to the standards of the Federal Constitution in theory or application. This Court is, therefore, entitled to assume that the correct stand-

ards of federal law have been applied. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

### ORDER

Therefore, it is ordered that petitioner's petition for a writ of habeas corpus be, and the same is hereby denied.

It is further ordered that respondent's motion to dismiss be, and the same is hereby allowed.