**John S. RUFFIN, Petitioner,**

v.

**K. B. BAILEY, Warden, Central Prison, Respondent.**

**Civ. No. 1660.**

United States District Court
E. D. North Carolina,
Raleigh Division.

April 1, 1966.

Henry A. Mitchell, Jr., of Smith, Leach, Anderson & Dorsett, Raleigh, N. C., for petitioner.

T. Wade Bruton, Atty. Gen. of North Carolina, by Theodore C. Brown, Jr., Staff Atty., Raleigh, N. C., for respondent.

## OPINION and ORDER

LARKINS, District Judge:

### SUMMARY

This cause comes before the Court upon a petition for writ of habeas corpus, filed in forma pauperis by a State prisoner, pursuant to the provisions of Title 28 U.S.C.A. § 2254. Issues were joined upon respondent making answer and filing motion to dismiss, which was allowed by this court on the 8th day of June, 1965.

Petitioner prosecuted an appeal to the United States Court of Appeals for the Fourth Circuit, alleging new grounds not previously presented to the district court; therefore, upon consent of this court it was ordered that the cause be remanded for further consideration in light of facts asserted on appeal for the first time.

The new grounds first asserted to the Court of Appeals are as follows:

(1) " * * * the authorities had coerced him into signing a confession, after a long and lengthy interrogation prior (sic), without the aid of counsel or being advised of his constitutional rights."

(2) " * * * he requested counsel to have his witnesses Subpoena, counsel refused, and stated 'You don't need any witnesses pleading guilty.' "

(3) " * * * counsel pleaded him guilty against his will, in order to hurry the case."

(4) " * * * Court-appointed counsel did, and willfully, plead the petitioner guilty against his will."

These contentions were directly controverted by affidavit of respondent; but the petition, record and response did not resolve the conflict. It was, therefore, determined that a plenary hearing was necessary.

On October 20, 1965, at 2:30 P.M., a plenary hearing in petitioner's behalf was undertaken, with petitioner being represented by court-appointed counsel. The hearing continued into the following day, October 21, 1965. During the course of this hearing, it developed that petitioner had been sent to a State mental institution upon his examination at Central Prison in Raleigh, thirty (30) days after his detention in that institution. It was immediately suggested by the court, upon this fact coming to light, that depositions of the State's psychiatrists involved in the commitment to the State mental institution be taken. Counsel agreed, and it was determined to fully explore the question of petitioner's mental capacity by means of deposition. These depositions have now been taken

and are before the court for its consideration.

## FINDINGS OF FACT

Petitioner was charged with the capital offense of first-degree murder of his infant son on June 29, 1962, in the Edgecombe County Superior Court, Case No. 4782, September 1962 Term.

Prior to the time petitioner was tried, and during the process of investigation of the death of his infant child, petitioner was interrogated concerning this death for which he was ultimately charged. During this interrogation petitioner made a confession.

The evidence taken at petitioner's hearing indicates the following sequence of events occurred leading to his arrest, confinement, interrogation and confession. After his baby was reported dead, the police started looking for petitioner and his wife. Petitioner's wife was the first of the two to be taken by the police. She was arrested by the police at the residence of petitioner at about 4:00 P.M. Sometime thereafter, petitioner was informed by members of his family that he was wanted by the police. He voluntarily came to the City of Rocky Mount, North Carolina, Police Headquarters in order to surrender. He surrendered to the police at about 6:00 P.M. on the same day his wife had been taken into custody.

When petitioner arrived at police headquarters, he was searched, advised of the charge against him and placed in custody. Shortly after, at about 7:00 P.M., petitioner was confronted with his wife, who proceeded to make a statement to the police in his presence. This statement clearly incriminated petitioner.

Petitioner was then advised of his rights to remain silent and to have the advice and assistance of legal counsel. He was also given the opportunity to make a telephone call at this time. Police Chief Hooker, of the City of Rocky Mount Police Department, stated that he insisted that petitioner call an attorney, but petitioner refused to do so.

Upon refusing an attorney, petitioner confessed to the smothering of his infant son. This confession was made during the course of a three-hour interrogation which began at about 8:00 P.M. and lasted until about 11:00 P.M. The confession was precipitated by his confrontation with his wife, which occurred about 7:00 P.M.

From the fact as developed at the plenary hearing, it is clear that petitioner was fully advised of his constitutional rights prior to making his confession. The confession was voluntarily made during the course of a three-hour interrogation and not upon the conclusion of it.

At petitioner's preliminary hearing, held on July 3rd, 1962, he had the opportunity to confer with an attorney, although he was not represented by him. Nothing of crucial significance was developed to the prejudice of petitioner at this hearing.

Petitioner also conferred with his mother at this hearing, and it was there determined to have her seek legal counsel for him. As a result of the conversation between petitioner and his mother at this hearing, his mother contacted petitioner's trial counsel.

Mr. H. Vinson Bridgers, an attorney of extensive criminal practice experience, was contacted. He interviewed petitioner in his jail cell and then interviewed the police officers who were involved in the investigation of the crime and in the interrogation of petitioner when he made his confession. He also interviewed the doctor who attended the deceased child.

Thereafter, and shortly before trial, Attorney Bridgers was formally appointed by the court to represent petitioner, who was financially unable to employ counsel. Petitioner's wife was also represented by another attorney of long experience and standing at the bar. That attorney was also appointed by the court.

Petitioner was advised by Attorney Bridgers of the maximum possible sen-

tence the court could impose in the event of a jury verdict of guilty of murder in the first degree, as was charged. He also explained the form and nature of a plea of guilty to the offense of murder in the first degree and the maximum possible sentence the court could impose if it was willing to accept such a plea.

Petitioner and Attorney Bridgers discussed the nature of the case and the strength and weaknesses thereof. Petitioner was advised to enter a plea of guilty. He consented to entering this plea freely and voluntarily and signed a statement to that effect, which reads as follows:

"STATE

VS                    No. 4782

JOHN S. RUFFIN          PLEA OF GUILTY

Now comes the above named defendant, John S. Ruffin, who stands charged in a bill of indictment filed herein with the capital crime of Murder in the First Degree, after his arraignment and through Hon. H. Vinson Bridgers, his attorney, heretofore appointed by the Court to represent said defendant, in open court hereby tenders a plea of Guilty to said charge of Murder in the First Degree, said plea of Guilty being made in writing pursuant to the terms and provisions of G.S. 15–162.1.

This the 18th day of September, 1962.

John S. Ruffin /s/
John S. Ruffin (Defendant)

Witness:

Don Gilliam, Jr. /s/
Clerk Superior Court Edgecombe County

H. Vinson Bridgers /s/
H. Vinson Bridgers, Counsel for the defendant John S. Ruffin"

"The above plea is accepted by the State.

Hubert E. May /s/
Hubert E. May, Solicitor.

APPROVED: Chester R. Morris /s/
Judge Presiding"

———◆———

At the trial, the plea of guilty was entered with the petitioner's knowledge and consent and in his presence, and in the presence of his mother and wife. Only one witness was then offered by the State, he being one of the investigating officers. This witness explained to the court the nature of the offense and described the evidence the State had against the petitioner. In this respect,

he testified concerning petitioner's confession. The court then imposed the mandatory sentence of life imprisonment, as required by statute. The charges against petitioner's wife were dismissed.

No witnesses were called by petitioner's attorney. None were needed nor were they appropriate because of the nature of the offense and of the plea. The

court had no discretion in making and passing judgment in this case.

All those who had contact with petitioner during this period, his attorney and the police officers, testified to petitioner's outward mental appearances and characteristics. He was noted as being outwardly calm, unemotional, and apparently able, in their judgment, to comprehend the distinction between right and wrong, and the nature of his plea and the proceedings against him.

The expert testimony presented by deposition indicates that it was possible for petitioner to determine the difference between right and wrong.

Dr. John F. Owens, Prison Psychiatrist at Central Prison, the first psychiatrist to see petitioner and who interviewed him on October 19, 1962, some thirty days after petitioner commenced the service of his sentence, testified as follows: That although he felt that petitioner "was suffering from an active mental disorder, a psychosis, * * *" (Depo. p. 4) he did know right from wrong. (See Depo. pp. 6 and 16.) It was Dr. Owens' opinion that the commission of the crime and the severity of the sentence had some bearing on the mental condition of petitioner. But, "even with his manifestations that he was grossly able to differentiate between right and wrong." (Depo. p. 19).

Dr. Owens would not say whether petitioner actually knew right from wrong at the time of the offense, but he did state that this type of disease was one that was coming on for years. (Depo. p. 25). He further stated that he would not be surprised if he was unable to so differentiate between right and wrong. (Depo. p. 20).

Dr. Evan C. Fowler, psychiatrist at Cherry Hospital in Goldsboro, North Carolina, the hospital where petitioner was sent for treatment, first saw him on November 19, 1962. He testified that this type of mental disease, or psychosis, existed prior to his first meeting with the petitioner. (Depo. p. 29). But he had no opinion as to petitioner's condition in September and June, 1962, the times of the trial and of the crime. Dr. Fowler also stated, " * * * even suffering from this illness he may be able to differentiate legally right from wrong." (Depo. p. 30).

Dr. Fowler did agree with Dr. Owens that petitioner was able to differentiate between right and wrong in October and November, 1962. (Depo. p. 35). But he also felt that there was some impairment of judgment. (Depo. p. 35).

In light of this testimony, coupled with that of the lay witnesses who had the opportunity to actually observe the petitioner at the time of his arrest, interrogation, confession, and at the time of the trial, the court finds petitioner was able to differentiate between right and wrong. He was so able to differentiate at both the time of the trial and at the time of the offense for which he was tried. He had that mental capacity required to assist in his defense, and he understandingly entered the plea of guilty.

## CONCLUSIONS OF LAW

Petitioner's first four contentions are related for purposes of this collateral proceeding. Involved is a plea of guilty and a confession. It is petitioner's contention that neither was voluntarily made. Upon the completion of petitioner's plenary hearing in this court, the evidence compels the court to find as a fact that the contrary is true.

He was interrogated, during which he confessed to the crime charged, the interrogation and the confession coming before the petitioner had conferred with legal counsel. But it is also a fact that he resisted the efforts made to persuade him to obtain counsel. In such circumstance, the case of Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), is controlling. One need not have legal counsel forced upon him, even in a capital case; thus, upon facts such as these, the principles stated in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) do not apply.

It is a fact that petitioner waived his right to be assisted by legal counsel, and he has failed to carry his burden of proving by the preponderance of the evidence that this waiver of a constitutional right was not freely and voluntarily made, although a waiver of such a right will not be lightly presumed. See Post v. Boles, 218 F.Supp. 658, 661 (N.D.W.Va.1963), affirmed in 332 F.2d 738 (4th Cir., 1964).

In relation to the confession and the voluntariness thereof, the court observes that although he was interrogated for three hours, he confessed during that period and not at the end of it. It was not a confession made as the result of three hours of interrogation, but the interrogation was for three hours, during which petitioner explained and detailed his commission of the crime. He had previously surrendered to the police, was thereupon confronted with his wife, who gave a statement in his presence, this statement incriminating him. It was at this point, or shortly thereafter, that petitioner refused to contact counsel and proceeded to tell all. See Davis v. North Carolina, 339 F.2d 770 (4th Cir., 1964); Bowler v. Warden, Md. Penitentiary, 236 F.Supp. 400 (D.Md.1964); and Hall v. Warden, Md. Penitentiary, 201 F.Supp. 639 (D.Md.1962), reversed for other reasons in 313 F.2d 483 (4th Cir., 1963); for facts and conclusions similar to the case at hand.

It is also clear that petitioner freely, voluntarily and intelligently entered a plea of guilty to the offense of murder in the first degree. He was faced with a possible death sentence, an emotionally-charged case against him, a strong case for the State, and his own confession to the crime. He had good reason to enter the plea with the knowledge that to do so would save his life. See Webster v. Dail, 246 F.Supp. 302 (E.D.N.C.1965), affirmed in No. 10,425 (4th Cir., decided Dec. 28, 1965). The petitioner has failed to sustain his burden of proof although given the opportunity to do so in a plenary hearing. See United States v. McNicholas, 298 F.2d 914 (4th Cir., 1962); Webster v. Dail, 246 F.Supp. 302, supra; and United States v. Tramaglino, 234 F.2d 489 (2nd Cir., 1956). It can be said, then, that if the plea of guilty was freely and voluntarily made, all those constitutional defects which may have occurred prior thereto may be deemed waived, and this would include the question of the obtaining of the confession under what might otherwise be questionable circumstances. Of course, the court does not imply that the confession was improperly obtained, only that it is now a moot question upon the determination that the plea of guilty was freely and voluntarily made. See Petway v. Stallings, 248 F.Supp. 991 (E.D.N.C. 1965), and cases cited therein at page 993.

The final issue, which was raised by the court, goes to the heart of all of petitioner's contentions, as well as to his ability to have committed the offense for which he now stands incarcerated. It is the issue of whether or not petitioner had the mental capacity to be responsible for the crime, confession and plea of guilty. Was petitioner capable of determining right from wrong?

Petitioner argues that this court, in a federal habeas corpus proceeding, should not be controlled by the North Carolina standard of mental capacity, but by that of the federal courts. To support this contention, the attention of the court is directed to the recent case of Noble v. Sigler, 351 F.2d 673 (8th Cir., 1965), which affirms the determination of the district court in a habeas corpus petition that petitioner in that case was mentally responsible for his criminal conduct. See Noble v. Sigler, 244 F.Supp. 445 (D.Neb.1964).

The *Sigler* case, 351 F.2d 673, supra, cited the case of Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), as standing for the proposition that the varying state standards of mental capacity should be discarded once the federal courts have obtained jurisdiction through habeas corpus. The law

is otherwise, however, in this Circuit. If it were as suggested, then all state prisoners would bring the ready jurisdiction of the federal courts into play in order to impose federal standards upon the states.

"This Court is controlled by the State of North Carolina's test of insanity at the time of the offense and at the time of petitioner's trial unless such test so flagrantly violates Federal Constitutional standards that it amounts to a denial of due process of law or equal protection of the laws." See Lovedahl v. State of North Carolina, 242 F.Supp. 938 (E.D.N.C.1965), remanded for reasons other than those stated in the opinion of the Court of Appeals in 350 F.2d 930 (4th Cir., decided Feb. 21, 1966).

The North Carolina standard is simply stated: Did the defendant have the mental capacity to distinguish right from wrong at the time and in respect to the matter involved? State v. Scales, 242 N.C. 400, 87 S.E.2d 916 (1955); State v. Willis, 255 N.C. 473, 121 S.E.2d 854 (1961); State v. Johnson, 256 N.C. 449, 124 S.E.2d 126 (1962); and Lovedahl v. State of North Carolina, 242 F.Supp. 938, supra.

Petitioner had this mental capacity, as well as that capacity to intelligently plead to the offense or assist his counsel in the preparation thereof. There is nothing to indicate that North Carolina standards of mental capacity are contrary to the minimal requirements established by the Federal Constitution. It is, therefore, concluded that the correct standards have been applied. See Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), and Lovedahl v. State of North Carolina, 242 F.Supp. 938, supra.

### ORDER

Therefore, it is ordered that the petition for a writ of habeas corpus be, and the same is hereby denied.

It is further ordered that respondent's motion to dismiss be, and the same is hereby allowed.