STATE OF NORTH CAROLINA v. JAMES FREDERICK FRANKS, JR.

No. 51

(Filed 6 May 1980)

1. **Criminal Law § 63— mental capacity of defendant—examination by non-treating psychiatrist—expert testimony based on personal knowledge**

   A psychiatrist could properly give an opinion based on personal knowledge that defendant knew the difference between right and wrong and the nature and quality of his acts at the time of a murder, although the psychiatrist was not treating defendant in an effort to cure him but observed, evaluated and diagnosed defendant to prepare himself to testify at defendant's trial, where the psychiatrist conducted thorough and professional examinations of defendant and took into account the entirety of what defendant said together with his own interpretation and analysis of it and the objective manifestations which accompanied it. Furthermore, since the opinion was admissible, the psychiatrist could properly testify concerning the content of his conversations with defendant in order to show the basis for his diagnosis.

2. **Criminal Law § 63— mental capacity of defendant—expert qualified to base opinion on personal knowledge—use of hypothetical question**

   Defendant could ask an expert witness a hypothetical question concerning whether defendant had a mental disease or defect even though the witness had personally examined defendant so that he was qualified to give an opinion based on his personal knowledge.

3. **Criminal Law § 63— mental capacity of defendant—prior attitudes and acts—remoteness**

   The trial court did not err in refusing to permit the forty-seven year old defendant to introduce testimony by his mother and sister regarding his

1

childhood attitudes, his school attendance, his father's drinking problems, and an episode when defendant was thirty years old when he cut his wrists with a razor blade, since the excluded testimony was too remote to have any relevance to defendant's mental condition at the time of the murder in question.

## 4. Criminal Law § 87.4 — exclusion of repetitious testimony on redirect

The trial court did not err in refusing to permit an expert witness to restate on redirect examination his opinion regarding defendant's mental illness where the testimony was merely repetitious and did not clarify testimony which had been cast into doubt on cross-examination, clarify new matter brought out on cross-examination, or refute testimony elicited on cross-examination.

## 5. Criminal Law § 96 — allowing motions to strike — instruction to disregard stricken evidence given at first of trial

Defendant was not prejudiced because the jury heard testimony which was stricken by the court upon motions by defendant where the court instructed the jury at the beginning of the trial not to consider the answer of a witness when a motion to strike was allowed and referred to this instruction when the motions to strike were allowed, although the better procedure is to give the instruction to disregard the answer immediately after allowing the motion to strike.

## 6. Criminal Law § 63 — mental capacity of defendant — exclusion of expert testimony — error favorable to defendant

A psychiatrist should have been allowed to state an opinion based on his personal knowledge obtained as a result of his examinations of and conversations with defendant as to whether defendant knew the difference between right and wrong or understood the nature and quality of his acts on the date of a murder, but the trial court's refusal on at least twenty-five occasions to permit the psychiatrist to state his opinion constituted error favorable to defendant.

## 7. Criminal Law § 50 — expert testimony — necessity for stating basis of opinion

The general rule is that when the facts are within an expert's personal knowledge, he may relate them first and then give his opinion or, in the discretion of the judge, he may give his opinion first and leave the facts to be brought out on cross-examination.

## 8. Criminal Law § 50 — expert's testimony as to relevant facts

Relevant facts may be testified to by an expert even if ultimately the expert is not allowed to state his opinion or conclusion concerning those facts.

## 9. Criminal Law § 53 — expert medical testimony — conversations with patient

A medical expert should not recount the content of conversations with a patient to show the basis for his opinion unless his opinion is admissible into evidence, since the content of those conversations is not substantive evidence and is admissible only to show the basis for the expert's opinion.

**10. Criminal Law § 53— expert medical opinion based on conversations with patient—determining admissibility of conversations**

Where a medical expert's opinion is based in part on conversations with the patient, (1) the expert may testify as to the background facts other than the content of conversations and then give his opinion, if admissible, followed by his testimony as to the content of the conversations on which his opinion was based, or (2) the trial judge may conduct a *voir dire* hearing and rule on the admissibility of the opinion, and if the opinion is ruled inadmissible and the only justification for admitting the conversations is to show the basis for the opinion, the content of the conversations is inadmissible.

**11. Criminal Law § 53— medical expert—opinion excluded—admission of conversations with patient—harmless error**

While it was error for the court to permit a psychiatrist to testify as to conversations with defendant during his examination of defendant since the court excluded the psychiatrist's opinion on defendant's mental capacity at the time of the crime, such error was not prejudicial to defendant where substantially the same information came into evidence when defendant testified in his own behalf and when his confession was admitted into evidence.

**12. Criminal Law § 75.9— voluntary confession—admissibility**

Defendant's confession was properly admitted in a murder trial where the evidence supported findings by the court that defendant was advised of his *Miranda* rights on a trip from Maryland to North Carolina, signed a written waiver of rights form, but did not implicate himself in the murder in response to questioning; the questioning then stopped; three to five hours later defendant initiated the conversation in which he admitted that he strangled the victim; and defendant's confession was not the result of interrogation but was volunteered and spontaneous.

**13. Criminal Law § 5.1— jury argument concerning defense of insanity—no impropriety**

The prosecutor's jury argument to the effect that a finding that defendant has a mental illness does not alone make out the defense of insanity but that the defense is not complete unless defendant did not know the difference between right and wrong or did not know the nature and quality of his acts was proper and did not violate a pretrial order prohibiting the prosecutor from referring to the fact that defendant would not be incarcerated if he was found not guilty by reason of insanity at the time of the crime but was found to be sane at the time of the trial.

**14. Criminal Law § 112.6— instructions—burden of proof of insanity—failure to define "satisfaction"**

The trial court was not required to define "satisfaction" as requested by defendant after instructing that defendant had the burden of proving insanity to the satisfaction of the jury.

**15. Criminal Law § 112.6— effect of mental disease on criminal intent—failure to give requested instructions**

The trial court, in instructing on the defense of insanity in a first degree murder case, did not commit prejudicial error in refusing to give defendant's

requested instruction that "criminal intent . . . is an essential element of murder, and if by reason of mental disease a person is incapable of forming any intent, he cannot be regarded by the law as guilty," since (1) if "criminal intent" in the requested instruction referred to a specific intent to kill, failure to so instruct was not prejudicial to defendant because the theory of diminished mental responsibility has not been adopted in this State and because the jury, by its verdict finding defendant guilty of first degree murder, found that defendant had the mental capacity to know right from wrong and thus that he had the lesser included mental capacity to form a specific intent to kill; and (2) if "criminal intent" referred to a general intent to perform the act constituting murder, the insanity instruction as given fully explained to the jury that defendant was not guilty of any offense if he did not have the intent to commit the act constituting murder.

APPEAL by defendant from *Smith (Donald J.)*, S.J. at the 16 July 1979 extended Special Criminal Session of WAKE County Superior Court.

Defendant was charged in an indictment, proper in form, with first degree murder in the death of Mary Poole Hamer. The State's evidence tended to show that in January, 1979, the defendant, an alcoholic, was attending the Wake County Alcoholic Treatment Center. There, he met Mary Hamer. When they both were discharged from the Center, she invited him to move in with her until he could find a permanent place to stay.

Defendant stated in his confession which was offered into evidence that on Thursday, 9 February 1979, he bought a pint of vodka and returned to the deceased's house. He took a drink from the bottle and she saw him. She said that she had been "dying for a drink" and she took a glass and went into the living room. Defendant did not see whether or not she took a drink. She returned to the kitchen, placed defendant's dinner before him at the table, and went over to the sink to wash dishes. Defendant further stated in his confession:

". . . Suddenly something came to me and something said to me to choke her. I know you think I'm lying but there was no argument or no words whatever between us. I got up and walked over to the sink, took a towel from the counter that she had been using. I wrapped the towel around her neck. When she faced me and I twisted it tight the only thing she said was please James, don't do this to me. Everything was hazy and then I turned her loose. She fell to the floor. I just don't know what happened to me."

Afterwards, defendant packed his clothes, took the deceased's money, her credit cards, and her car and headed for Baltimore, Maryland.

Neighbors became concerned when Mary Hamer did not answer her door or her telephone on 8 or 9 February 1979. On the morning of 10 February 1979, they discovered that the front door of her home was unlocked. The police were notified and they found the deceased's body in the kitchen of her home. Dr. Kaasa, a specialist in Pathology on the staff of Wake County Medical Center, performed the autopsy and testified that deceased "came by her death by asphyxiation by strangulation."

On 9 February 1979, defendant was arrested in Warren County for driving under the influence of intoxicating liquor. He was released the next morning and was arrested later that day near Dumfries, Virginia for public intoxication. The next day he was arrested near Perryville, Maryland for driving under the influence of intoxicating liquor. Defendant was searched and credit cards belonging to Mary Hamer were found in his possession.

North Carolina authorities were notified. Defendant waived extradition and was transported from Maryland to Raleigh, North Carolina. During the trip he was advised of his rights and he signed a waiver of rights form. He told the police officers he was willing to talk. At first he stated that Mary Hamer had given him her car and that he did not know anything about her death. Three to five hours later, he initiated a conversation with the officers in which he confessed that he strangled Miss Hamer and stated that he knew it was wrong to do so. This confession was not recorded because the police officer was driving the car and it was night-time. When they arrived in Raleigh defendant was again read his rights and he signed a waiver of rights form. He confessed that he strangled Mary Hamer. The confession was written down, defendant read over it, made corrections, and signed it.

Defendant testified in his own behalf. He admitted that he strangled Mary Hamer but stated that he does not know why he did it. He testified that, "I didn't know what I was doing. I'm satisfied I didn't know because if I did I wouldn't a killed the woman." He further testified that, "something just told me to do it and I just got up and choked her."

Dr. Harper, a psychiatrist, testified that his review of defendant's medical history revealed that "he has been in and out of the hospitals and institutions since he was fifteen. He has been twelve times at Dorothea Dix and he has been hospitalized at about six other hospitals." Dr. Harper examined the defendant on three occasions and found him "to be very upset and felt that he showed to me the appearance of a person suffering from mental illness, in that he was disturbed, suspicious and depressed." He testified that defendant had described auditory hallucinations to him. In response to a hypothetical question, Dr. Harper stated that in his opinion defendant "suffered then, as he does now, from chronic undifferentiated schizophrenia." On cross-examination he stated that in his opinion the defendant did know the difference between right and wrong and did understand the nature and quality of his acts with reference to the death of Mary Hamer.

The jury found defendant guilty of first degree murder. At the sentencing phase, the jury found no aggravating circumstances and recommended life imprisonment. The trial judge imposed that sentence and defendant appealed to this Court.

Other facts necessary to the decision of this case will be related in the opinion.

*C. Diederich Heidgerd for the defendant.*

*Attorney General Rufus L. Edmisten by Assistant Attorney General Richard L. Griffin for the State.*

COPELAND, Justice.

[1]  On cross-examination, Dr. Harper testified that in his opinion, based on his observations of and conversations with the defendant, defendant knew the difference between right and wrong and knew the nature and quality of his acts. Defendant maintains in his first assignment of error that Dr. Harper was not treating the defendant in an effort to cure him. At this time, he was merely observing, evaluating and diagnosing the defendant to prepare himself to testify at defendant's trial. Defendant argues that our decisions in *State v. Wade*, 296 N.C. 454, 251 S.E. 2d 407 (1979) and *State v. Bock*, 288 N.C. 145, 217 S.E. 2d 513 (1975), *death sentence vacated*, 428 U.S. 903 (1976), hold that such a non-treating physician cannot state his opinion based upon personal knowledge but may only respond to a hypothetical question.

Defendant's reading of *Wade* and *Bock* is completely erroneous. The rule is that when the facts upon which the expert bases his opinion " 'are all within the expert's own knowledge, he may relate them himself and give his opinion; or, within the discretion of the trial judge, he may give his opinion first and leave the facts to be brought out on cross-examination. . . .' " *State v. Abernathy*, 295 N.C. 147, 162, 244 S.E. 2d 373, 383 (1978), *quoting* 1 Stansbury, N.C. Evidence § 136, p. 446 (Brandis rev. 1973); *State v. Hunt*, 297 N.C. 258, 262, 254 S.E. 2d 591, 595 (1979); *State v. Hightower*, 187 N.C. 300, 121 S.E. 616 (1924).

In *State v. DeGregory*, 285 N.C. 122, 203 S.E. 2d 794 (1974), we held that it was proper to allow Dr. Robert Rollins of Dorothea Dix Hospital, whom the trial judge had ordered to examine the defendant, to give his opinion of defendant's mental capacity based on his personal examination and interview of the defendant, "and any other information contained in his official record. . . ." *Id.* at 131, 203 S.E. 2d at 800. Dr. Rollins specifically stated in his testimony quoted by this Court in *DeGregory* that, "I was not *treating* Mr. DeGregory. I was just *diagnosing*. . . ." *Id.* at 131, 203 S.E. 2d at 801 [Emphasis added.] It was further explained in *DeGregory* that the expert may have personal knowledge of some facts even though he did not personally make the observations in order to gather those facts.

> " 'With the increased division of labor in modern medicine, the physician making a diagnosis must necessarily rely on many observations and tests performed by others and recorded by them; records sufficient for diagnosis in the hospital ought to be enough for opinion testimony in the courtroom.' " *Id.* at 134, 203 S.E. 2d at 802, *quoting Birdsell v. United States*, 346 F. 2d 775, 779-80 (5th Cir.), *cert. denied*, 382 U.S. 963 (1965).

The specific issue in *Wade* and *Bock* was whether the expert could give his opinion *based upon his personal knowledge when that knowledge came from and his opinion was based upon (in whole or in part) conversations with the patient.* The rule was stated and applied in *Bock* as follows:

> " 'Where an expert witness testifies as to the facts based upon his personal knowledge, he may testify directly as to his opinion. Generally, however, an expert witness can-

not base his opinion on hearsay evidence. . . .' *Cogdill v. Highway Commission* and *Westfeldt v. Highway Commission*, 279 N.C. 313, 326, 182 S.E. 2d 373, 381 (1971). The opinion of a physician, however, is not ordinarily rendered inadmissible by the fact that it is based wholly or in part on statements made to him by the patient, *if those statements are made in the course of professional treatment and with a view of effecting a cure, or during an examination made for the purpose of treatment and cure. Penland v. Coal Co.*, 246 N.C. 26, 31, 97 S.E. 2d 432, 436 (1957). *See* 1 Stansbury's North Carolina Evidence § 136 (Brandis Rev., 1973). In such a situation it is reasonable to assume that the information which the patient gives the doctor will be the truth, for self-interest requires it. Here, however, Dr. Smith [who testified for the defendant] did not examine defendant for the purpose of treating him as a patient, but for the purpose of testifying as a witness for defendant in this case in which he is charged with first-degree murder. The motive which ordinarily prompts a patient to tell his physician the truth is absent here. The evidence was therefore incompetent and properly excluded." *State v. Bock, supra* at 162-63, 217 S.E. 2d at 524. [Emphasis in original.]

In *Wade*, the expert was Dr. Maloney to whom the defendant had been referred for treatment by Dorothea Dix Hospital. The general rule that an expert may give an opinion based on facts within his personal knowledge without resort to a hypothetical question was noted. Then, it was stated that "[p]roblems arise . . . when a physician's opinion is derived in whole or in part through information received from another . . . because of a second rule . . . that . . . 'an expert witness cannot base his opinion on hearsay evidence.' *Cogdill v. Highway Commission*, 279 N.C. 313, 327, 182 S.E. 2d 373, 381 (1971);" *State v. Wade, supra* at 458, 251 S.E. 2d at 409.

The Court noted, from a thorough analysis of the major cases on this issue, that a common element in our cases is the requirement that in order for the expert to be able to give an opinion based on his personal knowledge when that includes information supplied to the physician by others, including the patient, the information must be inherently reliable even though it is not independently admissible into evidence. When the opinion is ad-

missible the expert may testify to the information he relied on in forming the opinion, not for substantive purposes, but for the purpose of showing the basis of the opinion. *State v. Wade, supra.* Thus stated, it can be seen that *Bock* is but a more specific statement and application of the broader reliability requirement set forth in *Wade.*

In *Wade*, there were two indicia of reliability to support the admission of Dr. Maloney's opinion: defendant was sent to him as a patient for treatment and a sufficient indication of reliability was found in the nature of Dr. Maloney's entire examination. The nature of the examination was explained as follows:

> "The examination . . . was a thorough, carefully designed attempt to gain an understanding of defendant's state of mind. Dr. Maloney did not rely for his conclusions on any one statement by defendant or on any particular fact he disclosed. Instead he took into account the entirety of what defendant said together with his own interpretation and analysis of it and the objective manifestations that accompanied it. . . . Conversation, and its interpretation and analysis by a trained professional, is undoubtedly superior to any other method the courts have for gaining access to an allegedly insane defendant's mind. *When it is conducted with the professional safeguards present here, it provides a sufficient basis for the introduction of an expert diagnosis into evidence." Id.* at 463, 251 S.E. 2d at 412. [Emphasis added.]

Dr. Harper was not a treating physician but he conducted thorough and professional examinations of the defendant. He took into account the entirety of what defendant said together with his own interpretation and analysis of it and the objective manifestations that accompanied it. Thus, his opinion was properly admitted into evidence. *State v. Wade, supra.* Since the opinion was admissible, it was proper for him to testify concerning the content of his conversations with defendant in order to show the basis for his diagnosis. *Id.* This assignment of error is overruled.

[3]   Prior to putting Dr. Harper on the witness stand, defendant sought to introduce testimony from his sister and mother regarding his childhood attitudes, school attendance, his father's drinking problem, and an episode when defendant was thirty years old when he cut his wrists with a razor blade. (Defendant was age

forty-seven at the time of Mary Hamer's death.) Defendant at-
tempted to get this testimony in as foundation testimony upon
which to ask a hypothetical question of Dr. Harper concerning his
diagnosis of defendant's mental illness.

The trial judge refused to allow the testimony to be given.
He explained that, "I think that if you were to get Dr. Harper's
opinion in then you could go into how he reached that opinion; but
I think you're going at it backwards. . . . I think you can go into
it to explain the opinion that he is insane." This constitutes de-
fendant's fifth assignment of error.

[2]   Defendant did not desire to elicit Dr. Harper's opinion on in-
sanity. He wanted to ask Dr. Harper a hypothetical question con-
cerning whether defendant had a mental disease or defect. In this
State,

"'[a]n accused is legally insane and exempt from criminal
responsibility by reason thereof if he commits an act which
would otherwise be punishable as a crime, and at the time of
so doing is laboring under such a defect of reason, from
disease of the mind, as to be incapable of knowing the nature
and quality of the act he is doing, or, if he does know this, in-
capable of distinguishing between right and wrong in rela-
tion to such act.'" *State v. Potter*, 285 N.C. 238, 249, 204 S.E.
2d 649, 656 (1974), *quoting State v. Swink*, 229 N.C. 123, 125,
47 S.E. 2d 852, 853 (1948).

Establishing that defendant had a mental disease or defect at the
time of the commission of the crime is thus a relevant link in
defendant's chain of evidence, *see, State v. Vernon*, 208 N.C. 340,
180 S.E. 590 (1935), though standing alone it is not sufficient to
completely make out the defense of insanity. *State v. Potter*,
*supra.*

Furthermore, even though Dr. Harper had personally exam-
ined the defendant so that, as we have held above, he was
qualified to give an opinion based on his personal knowledge,
defendant nevertheless should not have been precluded from ask-
ing a hypothetical question if that is the manner in which he
wanted to elicit this testimony. 31 Am. Jur. 2d, *Expert and Opin-
ion Evidence* § 37 (1967) and cases cited therein. (Of course, the
reverse is not true. An expert with personal knowledge may base

his opinion on that knowledge without the use of a hypothetical question or he may respond to a hypothetical question; however, an expert without such personal knowledge may respond *only* to a hypothetical question. He is not qualified to give his opinion based on personal knowledge when, by definition, he has none.)

[3] Nevertheless, we uphold the rulings of the trial judge in refusing to admit this tesimony because it concerned times too remote to have any relevance to defendant's mental condition at the time of the death of Mary Hamer.

> "Where the line is to be drawn between evidence that is too remote and evidence that is not, is not a new question. The rule in this respect, which is in accord with our decisions, is given by Stansbury on Evidence, sec. 90, p. 170, as follows: 'Whether the existence of a particular state of affairs at one time is admissible as evidence of the same state of affairs at another time, depends altogether upon the nature of the subject matter, the length of time intervening, and the extent of the showing, if any, on the question of whether or not the condition had changed in the meantime. The question is one of the materiality or remoteness of the evidence in the particular case.'" *State v. Kelly*, 227 N.C. 62, 64, 40 S.E. 2d 454, 455 (1946).

In the case of *In re Will of Hargrove*, 206 N.C. 307, 173 S.E. 577 (1934), this Court held that testimony from witnesses concerning testator's mental capacity to write a will in 1906 was improper when those witnesses first became acquainted with testator at times ranging from two to twenty years after execution of the will. These times were too remote from the time in issue. The reasoning of *Hargrove* is applicable here. The most recent occurrence about which the defendant wanted to offer testimony was seventeen years prior to the death of Mary Hamer. We hold that this testimony involved defendant's mental condition at times too remote to have any probative value regarding the existence of any mental disease or defect at the time in issue in the case *sub judice*.

In any event, Dr. Harper did testify that defendant has a history of being in and out of mental hospitals since he was fifteen. Dr. Harper testified that, "[i]n a great many of these hospitals he received diagnoses compatible with disturbances in

his acting pattern of the things he was doing. In some of the other hospitals he received diagnoses of chronic undifferentiated schizophrenia, which would fit in with my own examination and my own observation." With this testimony in mind, the excluded testimony regarding specific events and attitudes of the defendant during his childhood and again at age 30 add nothing of probative value to this case. This assignment of error is overruled.

[4] Defendant's fourth assignment of error is that the trial judge improperly refused to allow Dr. Harper to restate on redirect examination his opinion regarding defendant's mental illness. This question sought merely repetitious testimony and thus was properly excluded. *Spivey v. Newman*, 232 N.C. 281, 59 S.E. 2d 844 (1950).

Defendant was not seeking to clarify testimony which had been cast into doubt upon cross-examination, to clarify new matter brought out on cross-examination, or to refute testimony elicited on cross-examination as was the case in *State v. McKeithan*, 293 N.C. 722, 239 S.E. 2d 254 (1977) and *State v. Cates*, 293 N.C. 462, 238 S.E. 2d 465 (1977). Indeed, on cross-examination Dr. Harper stated the very same opinion he had given during the direct examination that he felt defendant had a mental illness. On cross-examination he went further and stated that despite this mental illness he felt defendant nevertheless knew the difference between right and wrong. Defendant had no additional testimony concerning this latter opinion to bring out on redirect examination. He merely wanted Dr. Harper to state for at least the third time that defendant had a mental illness. The jury was fully aware of Dr. Harper's position in this respect. This assignment of error is overruled.

Defendant complains in his second and third assignments of error that Dr. Robert Rollins, the psychiatrist who examined the defendant when the trial judge referred him to Dorothea Dix Hospital for evaluation, could testify for the State only in response to a hypothetical question and could not give his opinion based on personal knowledge since he was not a treating physician.

At the points in the record where defendant took exceptions to Dr. Rollins' testimony relating to his second assignment of error, Dr. Rollins did not give an opinion based on his personal

knowledge. He was giving background or foundation facts concerning his examinations and observations of and conversations with the defendant. This and other such testimony will be examined below under defendant's sixth assignment of error. Defendant's second assignment of error is overruled.

[5]  At the points in the record where defendant took exceptions relating to his third assignment of error we need only note that defendant's motions to strike this testimony were in fact allowed by the trial judge. We find no prejudicial error in the fact that the jury actually heard the answers since they were instructed at the beginning of the trial not to consider the answer of any witness when a motion to strike was allowed. The trial judge referred to this instruction when, during the trial, the motions to strike were allowed. Although, this was not prejudicial error, we note that the better procedure is to give the instruction to disregard the answer immediately after allowing the motion to strike. *State v. Lyles*, 298 N.C. 179, 257 S.E. 2d 410 (1979); *State v. Greene*, 285 N.C. 482, 206 S.E. 2d 229 (1974); *Moore v. New York Life Insurance Co.*, 266 N.C. 440, 146 S.E. 2d 492 (1966). This assignment of error is overruled.

[6]  The district attorney asked Dr. Rollins on at least twenty-five occasions if he had an opinion based on his personal knowledge (obtained as a result of his examinations of and conversations with the defendant) as to whether defendant knew the difference between right and wrong or understood the nature and quality of his acts on 8 February 1979. The trial judge sustained defendant's objection each time the question was asked. Defendant argues that it was prejudicial error for the trial judge to allow the same question to be asked so many times. This constitutes defendant's eighth assignment of error.

Dr. Rollins was an expert who had personally examined the defendant. He was qualified to give his opinion on this question based on his personal knowledge (and not based on assumed facts set forth in a hypothetical question). *State v. DeGregory, supra.* This remains true even though the opinion would have been based in part on conversations he had had with the defendant. We find a sufficient indication of reliability in the thorough and professional examination conducted by Dr. Rollins to warrant admitting the opinion under *State v. Wade, supra.* This is true because

in the questioning it was revealed that Dr. Rollins had taken into account the entirety of what defendant said together with his own interpretation and analysis of it and the objective manifestations that accompanied it. On at least some of the occasions, the question was asked in a sufficiently proper form so that Dr. Rollins should have been allowed to state his opinion.[1] Thus, it was error favorable to the defendant for Dr. Rollins not to be allowed to give his opinion. This assignment of error is overruled.

In his sixth assignment of error, defendant maintains that since Dr. Rollins was in fact not allowed to state his opinion, it was prejudicial error to allow him to state the basis for and give the background or foundation facts for his opinion.

[7, 8]   The general rule is that when the facts are within the expert's personal knowledge, he may relate them first and then give his opinion; or, within the discretion of the trial judge, he may give his opinion first and leave the facts to be brought out on cross-examination. *State v. Abernathy, supra; Stansbury, supra* § 136 and cases cited therein; 31 Am. Jur. 2d *Expert and Opinion Evidence* § 38 (1967) and cases cited therein. Relevant facts may be testified to by an expert or any other witness even if ultimately the expert is not allowed to state his opinion or conclusion concerning those facts.

[9]   However, the situation is different where conversations between physician and patient are involved. In this instance, the expert should not recount the content of those conversations to show the basis for his opinion unless his opinion is admissible into

---

1. For example, the following question was proper in form:

"Q. Based on your conversations with Mr. Franks on February the 16th, 1979, based on your evaluation of previous psychiatric reports concerning admissions to Dorothea Dix Hospital and based on the events as they were related to you by Mr. Franks concerning the death of Mary Hamer on February the 8th, 1979; and based on your medical expertise; do you have an opinion satisfactory to yourself and based to a degree of reasonable medical certainty as to whether or not the defendant James Franks as a result of mental disease or of mental defect either did not know the difference between right and wrong, or did not understand the nature and quality of his act on February 8th, 1979, concerning the death of Mary Hamer?

Mr. Heidgerd: Objection.

Court: Sustained.

Exception No. 71"

evidence. The content of those conversations is not substantive evidence. The first issue when an opinion is based in whole or in part on conversations with the patient or others is the admissibility of the opinion (the reliability requirement.) If the opinion is admissible, then the expert may recount the content of those conversations to show the basis for his opinion. *State v. Wade, supra.*

[10]   Two routes are available in this situation. First, the expert may testify as to the background facts (other than the content of conversations) first and then give his opinion followed by testimony concerning the content of the conversations upon which his opinion is also based in whole or in part. If the opinion is not admitted, the conversations may not be recounted to the jury. Second, a *voir dire* hearing may be conducted. At the conclusion of this hearing, the trial judge will make his ruling on the admissibility of the opinion. If he rules it inadmissible, the expert may still testify as to any relevant facts within his knowledge but may not relate conversations he had with the patient unless there is an applicable hearsay exception. If the only justification for admitting the conversations is to show the basis for his opinion, obviously this justification is absent where the opinion may not be given. If the opinion is ruled admissible at the conclusion of the *voir dire* hearing, then the order of facts, conversations and opinion does not really matter since there is no danger of the conversations coming into evidence as the basis for the expert's opinion without the opinion also coming into evidence.

[11]   Here, it was not error for all of the facts, other than the content of the conversations, to come into evidence even though Dr. Rollins was not allowed to give his opinion. It was error for the conversations to come in but on the facts of this case the error was non-prejudicial since substantially the same information came into evidence when defendant testified in his own behalf and when his confession was admitted into evidence. This is the same information that defendant told to Dr. Rollins during his examinations of the defendant that Dr. Rollins recounted to the jury during the trial. Since there was no prejudicial error, this assignment of error is overruled.

[12]   Defendant's fourteenth assignment of error is that there is insufficient evidence to support the trial judge's findings of fact and conclusion of law that his confession was admissible.

The evidence does support the finding that defendant was advised of his Miranda rights at a rest stop on the trip from Maryland to North Carolina. No questioning occurred before defendant was advised of his rights. After being so advised defendant signed a written waiver of rights form. In response to questioning, he did not implicate himself in the killing of Mary Hamer. The questioning then stopped. Three to five hours later, defendant initiated the conversation in which he admitted that he strangled Mary Hamer. There is evidence to support the findings and the findings support the conclusion that this confession was not the result of interrogation but was "knowingly, intentionally, freely and voluntarily, spontaneously" made. This assignment of error is overruled.

[13] By his ninth assignment of error, defendant contends that the trial judge erred in refusing to sustain his objection to a portion of the district attorney's closing argument and to instruct the jury to disregard those remarks.

Prior to trial, a ruling was made upon defendant's motion *in limine* to restrict the remarks of the district attorney during the jury *voir dire* and the trial. The applicable portion of the order is as follows:

"IT IS THEREFORE ORDERED that the District Attorney is hereby prohibited, during the course of the jury voir dire and trial, from making any reference, directly or indirectly, to any of the following matters, separately or severally:

. . .

. . .

3. References to the fact that if the defendant is found not guilty by reason of insanity at the time the offense was committed but is found presently sane, that the defendant would not be incarcerated but would be legally free."

The complained of portion of the district attorney's closing argument is as follows:

"You might be satisfied that had it not been for him being mentally ill or suffering from a mental defect that he might not have killed Mary Hamer; a causal relationship, but for, had it not been for this mental disease or mental defect this

would not have happened, the death of Mary Hamer. You might go back there and be satisfied of that and you might say that's the reason he did it. The reason he killed Mary Hamer was because he was mentally ill.

Ladies and gentlemen, that's not enough. I say that you might find that because there seems to be no other explanation as to why he killed her but that is not enough. If you're satisfied that there is a causal connection, again, you must find that he did not know the difference between right and wrong or did not understand the nature and quality of his act.

[You might not think that's a fair law. You might agree with it. You might think that if a person kills somebody because they are mentally ill that they ought to be able to walk out the door and be put back out on the streets; but you are obliged to follow the law and that's what the law says and I'm sure that you will follow the law.]

MR. HEIDGERD: OBJECTION and motion to strike that statement.

COURT: OVERRULED.

EXCEPTION NO. 108."

This argument is not in violation of the pretrial order because the argument does not refer to the consequences of being found not guilty by reason of insanity. It refers to the consequences of finding that the defendant has a mental illness. That alone is not enough to make out the defense of insanity. The defense is not complete unless the mental illness causes the defendant to not know the nature and quality of his acts or, if he does know his actions, to not know the difference beween right and wrong. This argument was especially pertinent for the State to make in the light of Dr. Harper's testimony that defendant had a mental illness but still knew the nature and quality of his actions and knew the difference between right and wrong. This assignment of error is overruled.

[14] Defendant's tenth assignment of error is that the trial judge was obligated to define "satisfaction" after instructing the jury that defendant had the burden of proving insanity to the satisfaction of the jury.

The trial judge instructed the jury in relevant part as follows:

"If you find from the evidence beyond a reasonable doubt that the defendant choked or strangled Mrs. Hamer, you must then determine if the defendant was insane when that act occurred. In regard to this question the defendant has the burden of proving insanity. However, he need not prove this beyond a reasonable doubt but he need prove it, if at all, only to your satisfaction."

Defendant requested that "satisfaction" be defined as follows:

"To the satisfaction of the jury simply means such evidence as satisfies the jury of the truth of the matter and the jury alone is the judge of its satisfaction."

This instruction would have added nothing whatsoever to what the jury was told since defendant defines "satisfaction" as "such evidence as satisfies." The jury knew that what satisfied it was for its own determination and, from the trial judge's instructions, the standard is less than the reasonable doubt standard. The jury is presumed to have understood the plain English contained in Judge Smith's instructions. This assignment of error is overruled.

[15]  By his eleventh assignment of error, defendant contends that the trial judge erred in refusing to give a certain requested instruction on the defense of insanity.

The trial judge instructed the jury virtually verbatim from defendant's request except he left out that portion of the request that is enclosed in brackets:

"Now I instruct you that sanity or soundness of mind is the normal condition of men. Therefore the law presumes that everyone is sane until the contrary is made to appear. The defendant in this case would be insane if, at the time of the alleged crime and as a result of mental disease or defect, he either did not know the nature and quality of his act or did not know that it was wrong. Thus, the mere existence of a mental disease or defect is not sufficient. The disease or defect, if any, must have so impaired the defendant's mental capacity that he either did not know the nature and quality of his act or he did not know that it was wrong.

On the other hand, it need not be shown that the defendant lacked mental capacity with regard to all matters. A person may be sane on every subject but one but yet if his mental disease or defect with reference to that one subject rendered him unable to know the nature and quality of his act with which he is charged, or know that the act was wrong, then his defense would be complete [for he was not responsible for his acts and he is not guilty of any offense against the law as guilt arises from the mind and wicked will. Criminal intent, of course, is an essential element of murder, and if by reason of insanity or mental disease a person is incapable of forming any intent, he cannot be regarded by the law as guilty.]

So I charge you that if you're satisfied that the defendant was insane at the time of the choking or strangulation of Mary Hamer, he would not be guilty by reason of insanity, and that would end the case.

However, if you were not satisfied, then you would be required to determine whether he was guilty of first degree murder, second degree murder, voluntary manslaughter; or whether he is in fact not guilty of that offense."

While the portion of the above instructions that is enclosed in brackets is a correct statement since a similar instruction with a reference to criminal intent was approved in *State v. Bracy*, 215 N.C. 248, 1 S.E. 2d 891 (1939), *overruled on other grounds, State v. Hammonds*, 290 N.C. 1, 224 S.E. 2d 595 (1976), its omission in this case was not prejudicial error. It is not clear whether the reference to "criminal intent" is a reference to a specific intent to kill (first degree murder) or is a reference to a general intent to commit the act constituting murder.

If the reference is to a specific intent to kill, then defendant's position has been expressly rejected by this Court. *State v. Harris*, 290 N.C. 718, 228 S.E. 2d 424 (1976); *State v. Shepherd*, 288 N.C. 346, 218 S.E. 2d 176 (1975) (no error in the trial judge's failure to instruct the jury as to the effect of insanity or mental weakness on premeditation and deliberation which includes a specific intent to kill). *See also, State v. Cooper*, 286 N.C. 549, 213 S.E. 2d 305 (1975) in which we found no reversible error in the trial judge's refusal to instruct that a mental deficiency or disease

could prevent a defendant from forming a specific intent to kill which is required for a conviction of first degree murder by premeditation and deliberation. There was no error because, as is true in the case *sub judice*, the jury found the defendant guilty of first degree murder. The jury, by its verdict, established that the defendant, at the time of the alleged offenses, had the mental capacity to know right from wrong with reference to these acts. It requires less mental ability to form a specific purpose to do an act than to determine its moral quality. Since the jury found, by its verdict, that the defendant had this greater mental capacity (the ability to know right from wrong) it necessarily follows that he had the lesser included mental capacity (the ability to form a specific intent to kill). *Id.*

We held in *State v. Shepherd, supra,* that we have not adopted this theory of diminished mental responsibility. In this State the test for insanity which is a complete defense to a criminal charge is,

> "whether the accused, at the time of the alleged act, was laboring under such a defect of reason, from disease or deficiency of the mind, as to be incapable of knowing the nature and quality of the act, or, if he does know this, was, by reason of such defect of reason, incapable of distinguishing between right and wrong in relation to such act." *State v. Jones,* 293 N.C. 413, 425, 238 S.E. 2d 482, 490 (1977); *accord, State v. Pagano,* 294 N.C. 729, 242 S.E. 2d 825 (1978); *State v. Willard,* 292 N.C. 567, 234 S.E. 2d 587 (1977); *State v. Harris, supra; State v. Hammonds, supra; State v. Cooper, supra; State v. Humphrey,* 283 N.C. 570, 196 S.E. 2d 516, *cert. denied,* 414 U.S. 1042 (1973); *State v. Johnson,* 256 N.C. 449, 124 S.E. 2d 126 (1962).

If the reference to "criminal intent" in the above requested instruction is a reference to a general intent to perform the act constituting murder, then clearly there was no error in omitting this part of the request. It appears from the context of the entire requested instruction that it is a reference to a general intent because the requested instruction reads that if that intent is absent and the "person is incapable of forming any intent, he cannot be regarded by the law as guilty." In other words, if the intent to commit the act constituting murder is absent defendant is not

guilty of any offense. The insanity instruction as given fully explains this point to the jury.

The jury was fully and adequately instructed regarding the definition of insanity in this State, the burden of proof on the defense, and that it is a complete defense resulting in a verdict of not guilty by reason of insanity. If one does not know the nature and quality of his acts or does not know the *difference between right and wrong*, then, by definition, he does not have a *criminal* intent. This assignment of error is overruled.

Defendant has abandoned assignments of error numbers seven, twelve, thirteen, fifteen and sixteen since he did not bring them forward and argue them in his brief. Rule 28(a), (b)(3), Rules of Appellate Procedure.

Defendant was "entitled to a fair trial but not a perfect one." *Lutwak v. United States*, 344 U.S. 604, 619, 97 L.Ed. 593, 605, 73 S.Ct. 481, 490 (1953); *accord, State v. Hough*, 299 N.C. 245, 262 S.E. 2d 268 (1980). Defendant received a fair trial free from prejudicial error and we find

No error.