STATE OF NORTH CAROLINA v. JULIUS LEE CASS

No. 8123SC251

(Filed 5 January 1982)

1. **Criminal Law § 75.1— unreasonable seizure of person—statements inadmissible**

    Statements obtained during an unreasonable seizure of the person are not admissible.

2. **Criminal Law § 75.1— no seizure of person—admissibility of incriminating statements**

    Defendant was never "seized" within the meaning of the Fourth Amendment to the U.S. Constitution, and his incriminating statement to officers at the sheriff's office prior to his formal arrest was thus not rendered inadmissible by Fourth Amendment exclusionary principles, where an officer first contacted defendant at his home at 4:00 p.m. and told defendant he needed to talk to him with reference to the death of defendant's wife; defendant sat in the patrol car at the officer's request and later agreed to accompany the officer to the jail; prior to 7:00 p.m. defendant voluntarily participated in the investigation of his wife's death when he submitted to interrogation; defendant would

have been permitted to leave at any time he expressed a desire to do so; although the officer thought he had probable cause to arrest defendant at 7:00 p.m., he did not arrest defendant at that time; defendant was interrogated between 7:00 p.m. and 10:00 p.m., when he made the incriminating statement; and defendant's initial assent to submit to investigatory questioning and to accompany the officer to the jail remained unchanged throughout the evening. Furthermore, defendant's statement was properly considered in determining probable cause for issuance of a warrant for defendant's arrest, and defendant's subsequent statements to officers while he was in custody pursuant to an arrest warrant based on probable cause were not rendered inadmissible by Fourth Amendment exclusionary principles.

**3. Criminal Law §§ 75.11, 75.14— incriminating statements—waiver of constitutional rights—competency of defendant**

The evidence on voir dire supported findings by the trial court, with regard to each of defendant's incriminating statements, that the officers fully explained his constitutional rights to him, that he indicated he understood them, and that defendant had in fact understood his rights and voluntarily waived them. Testimony elicited on voir dire that defendant did not sign a waiver form, that the officers did not know whether defendant could read or write, and that defendant jumped from one subject to another during questioning did not compel a finding that defendant was incompetent to waive his rights voluntarily and knowingly.

**4. Criminal Law § 76.4— reopening of voir dire testimony—leading questions**

The trial court did not abuse its discretion in permitting the State to reopen the voir dire examination of a deputy sheriff during a hearing on defendant's motion to suppress incriminating statements or in allowing leading questions to the deputy upon the reopened voir dire.

**5. Searches and Seizures § 14— seizure of pistol—consent to search**

An officer lawfully seized a pistol which he found between the mattress and springs of a bed in defendant's house where uncontradicted evidence showed that defendant knowingly and voluntarily consented to the officer's search of his house.

**6. Homicide § 20— identity of pistol as murder weapon**

A pistol was sufficiently identified as the weapon used in the murder of defendant's wife for its admission into evidence where an officer testified that he found the pistol between the mattress and springs of a bed in defendant's house on the afternoon decedent was killed, that defendant told him that when he went to decedent's house that afternoon he had carried the pistol with him, and that the pistol was a small caliber weapon and the wound he observed on decedent's body was a small caliber wound, and where medical testimony established that decedent died from a single gunshot wound to the neck.

**7. Criminal Law § 63.1— prior I.Q. tests—inadmissibility**

The trial court did not err in refusing to permit a psychiatrist who testified as to the result of an I.Q. test administered to defendant while defendant was being evaluated in connection with this case to give further

testimony as to the results of other I.Q. tests previously administered to defendant where there was no evidence indicating when the prior tests were administered, since the relevance of these tests to defendant's mental capacity at the time the alleged crime was committed thus was not established.

8. **Criminal Law § 29.1 — mental capacity to stand trial at earlier time**

The trial court properly excluded testimony by a psychiatrist that defendant was incapable of standing trial when he was admitted to a hospital for evaluation six days after decedent's death and eleven months before trial since the issue of defendant's capacity to stand trial should have been determined prior to the trial, and since the appropriate issue would have been defendant's capacity to stand trial at the time of trial, not at the time of his hospitalization eleven months earlier.

9. **Criminal Law § 63.1 — prior hospitalizations for mental treatment — remoteness**

The trial court properly excluded testimony by an expert psychiatric witness as to what defendant had told him regarding his previous hospitalizations for mentally related problems during a period between 1958 and 1967 since such testimony concerned times too remote to have any relevance to defendant's mental condition at the time of decedent's death.

10. **Criminal Law §§ 33.3, 63.1 — mental competency — irrelevant testimony — absence of prejudice**

The defendant in a homicide case was not prejudiced by the testimony of a psychiatrist that sixty to seventy percent of the population has a neurosis and that, if the jurors are average citizens, a little over half of them have a neurosis.

11. **Criminal Law § 63.1 — insanity at time of crime — competency of testimony**

Testimony by a psychiatrist that "in the general sense" defendant knew the difference between right and wrong was relevant and admissible on the issue of whether defendant was legally insane and thereby exempt from criminal responsibility.

12. **Homicide § 21.9 — voluntary manslaughter — sufficiency of evidence**

The State's evidence, including incriminating statements made by defendant, was sufficient to support the conviction of defendant for involuntary manslaughter of his wife.

13. **Homicide § 27.2 — instructions on involuntary manslaughter — meaning of criminal negligence**

The trial court did not err in instructing that involuntary manslaughter is the unintentional killing of a human being by an unlawful act not amounting to a felony or by an act done in a criminally negligent way without explaining the meaning of "criminal negligence" where the court further explained that to find defendant guilty of involuntary manslaughter, the jury must find that defendant's act was unlawful, and that the act was unlawful if it was an assault with a deadly weapon.

APPEAL by defendant from *Mills, Judge.* Judgment entered 14 November 1980 in Superior Court, WILKES County. Heard in Court of Appeals 15 September 1981.

On 7 December 1979 at approximately 2:35 p.m. defendant's estranged wife (hereinafter decedent) was found in her house dead from a single gunshot wound in the neck. Defendant was charged with murder and was convicted of voluntary manslaughter. From a judgment of imprisonment, defendant appeals.

*Attorney General Edmisten, by Assistant Attorney General Sarah C. Young, for the State.*

*Paul W. Freeman, Jr., for defendant appellant.*

WHICHARD, Judge.

### ADMISSIBILITY OF DEFENDANT'S STATEMENTS

Defendant challenges the admissibility of three inculpatory statements which he made, one in the late evening of 7 December 1979 prior to his formal arrest, and two the following morning subsequent to his arrest and while he was in custody. He contends (1) his statements were the product of a seizure which violated his fourth amendment rights, and (2) he lacked the mental capacity to waive his fifth and sixth amendment rights.

The following facts surrounding the making of the statements: Deputy Sheriff Nick Nixon arrived at decedent's residence at approximately 4:00 p.m. on 7 December 1979. After observing the scene briefly he drove to defendant's residence. Nixon "asked defendant whether he would go have a seat in the patrol car," and defendant agreed to do so. Nixon identified himself as a detective with the sheriff's department, explained that defendant's wife had been found dead in her house, and told defendant he needed to talk to him with reference to his wife. Nixon advised defendant of his Miranda rights, explained them to him, and began to question defendant in the patrol car. After a brief period of questioning Nixon "got [defendant] out of the car" and requested permission to search the house. Defendant consented to the search, which produced a .22 caliber pistol found between the mattress and springs of a bed.

Defendant, still not under arrest, agreed to accompany Deputy Nixon to the jail. When they arrived at the jail at approximately 5:45 p.m., Nixon again advised defendant of his constitutional rights. Beginning at 5:45 p.m. Nixon and two other officers questioned defendant for approximately an hour in the jail area. They then moved defendant to the Sheriff's office and continued questioning him until approximately 10:00 p.m. when defendant made an inculpatory statement. Defendant was formally arrested and served with a warrant shortly after 10:00 p.m.

The following morning at approximately 9:43 a.m. State Bureau of Investigation Agent Steve Cabe and Sheriff Kyle Gentry again questioned defendant who was then in custody. Before beginning their questioning Cabe and Gentry advised defendant of his Miranda rights. After Cabe and Gentry questioned defendant, defendant repeated the statement he had made the previous night. Cabe then left the room, and Gentry continued the questioning. Defendant made a further statement to Gentry.

### 1. *Fourth Amendment*

[1]  "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV [applicable to the states through the fourteenth amendment, *Mapp v. Ohio*, 367 U.S. 643, 6 L.Ed. 2d 1081, 81 S.Ct. 1684 (1961)]. Statements obtained during an unreasonable seizure of the person are not admissible. *Dunaway v. New York*, 442 U.S. 200, 60 L.Ed. 2d 824, 99 S.Ct. 2248 (1979); *Brown v. Illinois*, 422 U.S. 590, 45 L.Ed. 2d 416, 95 S.Ct. 2254 (1975); *Davis v. Mississippi*, 394 U.S. 721, 22 L.Ed. 2d 676, 89 S.Ct. 1394 (1969). The fourth amendment reasonableness requirement prohibits formal arrests except upon probable cause. *See Gerstein v. Pugh*, 420 U.S. 103, 111-112, 43 L.Ed. 2d 54, 64, 95 S.Ct. 854, 862 (1975). The reasonableness requirement applies to investigatory seizures, as well as to the more intrusive technical arrest. The United States Supreme Court has stated that "to argue that the Fourth Amendment does not apply to the investigatory stage is fundamentally to misconceive the purposes of the Fourth Amendment." *Davis*, 394 U.S. at 726, 22 L.Ed. 2d at 680, 89 S.Ct. at 1397. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16, 20 L.Ed. 2d 889, 903, 88 S.Ct. 1868, 1877

(1968). With the limited exception of a brief "stop and frisk" based upon reasonable suspicion of criminal conduct supported by articulable and objective facts, any "seizure," whether it bears the cloak of a formal arrest or merely amounts to an investigatory detention, must be founded upon probable cause. *Dunaway*, 442 U.S. at 214, 60 L.Ed. 2d at 837, 99 S.Ct. at 2257.

The Constitution does not, however, prevent law enforcement officers from questioning anyone willing voluntarily to answer. The governmental interest in effective crime control permits officers in appropriate circumstances and in an appropriate manner to direct questions to citizens even though they have no probable cause for an arrest. *Terry*, 392 U.S. at 22, 20 L.Ed. 2d at 906-907, 88 S.Ct. at 1880. But, "while the police have the right to request citizens to answer voluntarily questions concerning unsolved crimes[,] they have no right to compel them to answer." *Davis*, 394 U.S. at 727 n. 6, 22 L.Ed. 2d at 681, 89 S.Ct. at 1397.

[2] The issue for determination here, pursuant to the foregoing fourth amendment principles, is whether defendant's inculpatory statements were the product of an unreasonable seizure. The case does not fall within the limited exception to the probable cause requirement espoused in *Terry v. Ohio*, because the investigation was neither brief nor a mere "stop and frisk." In addition, Deputy Nixon admittedly began his investigatory interrogation of defendant without probable cause to arrest. The *Davis, Brown*, and *Dunaway* line of cases does not require exclusion of defendant's statements, however, because defendant was never "seized" within the meaning of the fourth amendment.

The trial court found the following facts: Defendant sat in the patrol car at Nixon's request and agreed to go to the jail with Nixon. Prior to seven o'clock defendant voluntarily participated in the investigation of his wife's death when he submitted to interrogation. He would have been permitted to leave at any time had he expressed a desire to do so.

These findings are supported by Deputy Nixon's voir dire testimony and therefore are conclusive on appeal. *State v. Thompson*, 296 N.C. 703, 252 S.E. 2d 776 (1979). On these facts, no seizure of defendant occurred between approximately 4:00 p.m. when Nixon first contacted defendant at his home and 7:00 p.m.

that evening. *Terry,* 392 U.S. at 22, 20 L.Ed. 2d at 906-907, 88 S.Ct. at 1880.

The State presented conflicting evidence concerning the period between 7:00 p.m. and 10:00 p.m. During the initial voir dire on the motion to suppress defendant's first inculpatory statement, Nixon stated that from the time he took defendant to the jail, defendant was not free to leave, and that only when defendant gave his statement did Nixon obtain sufficient evidence to secure an arrest warrant. Following a recess, when counsel for the State and the defendant indicated they had no further questions of Nixon on voir dire, the State requested and received permission to recall Nixon for additional voir dire. During the second portion of the voir dire, Nixon stated that at 7:00 p.m., based on defendant's responses to interrogation and information obtained from an investigator who had questioned decedent's friends, he had obtained evidence which he "felt" gave him probable cause to arrest defendant for the murder. Nixon stated that until 7:00 p.m. had defendant asked to leave he would have been permitted to do so, but that after 7:00 he would not have been allowed to leave.

Although Nixon testified when recalled that he "felt like [he] had probable cause to arrest [defendant] at [7:00 p.m.]," he did not arrest defendant at that time; and there has been no judicial determination that probable cause for defendant's arrest existed at 7:00 p.m. Therefore, the interrogation of defendant between 7:00 and 10:00 cannot be justified as occurring during custody based on probable cause. However, the court's findings of fact, based upon competent evidence, indicated that defendant began the interrogation as a voluntary participant and at no time became a non-voluntary participant. His initial assent to submit to investigatory questioning and to accompany Nixon to the jail remained unchanged throughout the evening. Defendant, therefore, was at no time prior to making his first inculpatory statement "seized" within the meaning of the fourth amendment. Consequently, the statement was not rendered inadmissible by fourth amendment exclusionary principles. In addition, because the statement was not impermissibly obtained, it was properly considered in determining probable cause for issuance of a warrant for defendant's arrest.

Defendant's subsequent statement to Agent Cabe and Sheriff Gentry, and his further statement to Gentry alone, were made while in custody pursuant to an arrest warrant based on probable cause. Thus they, too, were not made while defendant was illegally seized in violation of the fourth amendment, and were not thereby rendered inadmissible by fourth amendment exclusionary principles.

## 2. *Fifth and Sixth Amendments*

"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V [applicable to the states through the fourteenth amendment, *Malloy v. Hogan*, 378 U.S. 1, 12 L.Ed. 2d 653, 84 S.Ct. 1489 (1964)]. "In all criminal prosecutions the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI [applicable to the states through the fourteenth amendment, *Gideon v. Wainwright*, 372 U.S. 335, 9 L.Ed. 2d 799, 83 S.Ct. 792 (1963)]. The right to the assistance of counsel attaches when a person is subjected to custodial interrogation, *Escobedo v. Illinois*, 378 U.S. 478, 12 L.Ed. 2d 977, 84 S.Ct. 1758 (1964), and "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination," *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L.Ed. 2d 694, 706, 86 S.Ct. 1602, 1612 (1966). The *Miranda* Court prescribed the following procedural safeguards:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

384 U.S. at 444, 16 L.Ed. 2d at 706-707, 86 S.Ct. at 1612.

[3] We need not determine whether defendant's statements were the product of "custodial interrogation," because the evidence unequivocally shows that several times prior to making the inculpatory statements defendant was fully advised of his *Miranda* rights. The question presented is whether defendant

knowingly and intelligently waived effectuation of these rights. He contends he was not mentally competent to make a knowing and intelligent waiver.

The trial court found, with regard to each of defendant's statements, that the officers fully explained his constitutional rights to him and that he indicated he understood them. The court also found that defendant had understood his rights and voluntarily waived them. The court's findings are supported by the officers' testimony on voir dire and, therefore, are conclusive on appeal. *State v. Small,* 293 N.C. 646, 239 S.E. 2d 429 (1977). The testimony elicited on voir dire that defendant did not sign a waiver form, that the officers did not know whether defendant could read or write, and that defendant jumped from one subject to another during questioning, did not compel a finding that defendant was incompetent to waive his rights voluntarily and knowingly. Determinations of admissibility are the function of the trial court after a hearing out of the presence of the jury. G.S. 15A-977. Competent evidence not presented during the suppression hearings, such as the subsequent testimony before the jury that defendant had a prior history of mental unfitness, was not before the court when it ruled on the admissiblity of defendant's statements. Although "[t]he courts must presume that a defendant did not waive his rights [and] the prosecution's burden is great," *North Carolina v. Butler,* 441 U.S. 369, 373, 60 L.Ed. 2d 286, 292, 99 S.Ct. 1755, 1757 (1979), we find that the State carried its burden of proving an effective waiver on each inculpatory statement.

For the foregoing reasons, the trial court properly admitted defendant's statements.

RE-OPENING OF VOIR DIRE;
LEADING QUESTIONS

[4] Defendant assigns error to the court's allowing reopening of the voir dire examination of Deputy Nixon. "It is within the discretion of the trial judge to permit, in the interest of justice, the examination of witnesses at any stage of trial. . . . This discretion to determine the order of testimony will not be interfered with unless it is abused." *State v. Johnson,* 23 N.C. App. 52, 57, 208 S.E. 2d 206, 210, *cert. denied* 286 N.C. 339, 210 S.E. 2d

59 (1974). We find no abuse of discretion in the re-opening of Deputy Nixon's voir dire examination.

Defendant also assigns error to the court's allowing leading questions to Deputy Nixon upon the re-opened voir dire. " '[I]t is firmly entrenched in the law of this State that it is within the sound discretion of the trial judge to determine whether counsel shall be permitted to ask leading questions, and in the absence of abuse the exercise of such discretion will not be disturbed on appeal.' " *State v. Davis*, 290 N.C. 511, 536, 227 S.E. 2d 97, 113 (1976), *quoting from State v. Greene*, 285 N.C. 482, 492, 206 S.E. 2d 229, 235 (1974). We find no abuse of discretion in the allowance of the questions asked of Deputy Nixon on the re-opened voir dire.

## ADMISSIBILITY OF PISTOL

[5] Defendant challenges the admissibility of the pistol which Deputy Nixon found between the mattress and springs of a bed in defendant's house. He contends (1) the pistol was the product of an impermissible seizure, and (2) there was insufficient evidence that it was the weapon used in the killing of his wife.

Deputy Nixon had testified as follows:

I . . . told [defendant] I would like to search his home for a gun and ask[ed] whether it would be all right if I looked around [,] and he told me to go ahead and look all I wanted to. . . .

. . . .

At the time that I asked him whether I could search his residence, he voluntarily told me to go right ahead and do it. He did not in any way try to prevent me from searching his residence.

This testimony was uncontradicted. Nothing in the record compelled a finding that defendant lacked the requisite mental capacity to give a voluntary and knowing consent to search. "Consent to search, freely and intelligently given, renders competent the evidence thus obtained." *State v. Frank*, 284 N.C. 137, 143, 200 S.E. 2d 169, 174 (1973). We have held, *supra*, that defendant was not illegally seized when he gave the consent to search. We thus

find without merit defendant's contention that the pistol was the product of an impermissible seizure.

[6] We also find without merit defendant's contention that there was insufficient evidence that the pistol was the weapon used in the killing of his wife. Deputy Nixon had testified without objection that he found the pistol between the mattress and springs of a bed in defendant's house on the afternoon decedent was killed. He further testified without objection that defendant had told him that when he went to decedent's house that afternoon he had carried the pistol with him, and that the pistol was a small caliber weapon, and the wound he had observed on decedent's body was "a small caliber wound." Medical testimony had established that decedent died from a single gunshot wound to the neck.

"[W]eapons may be admitted where there is evidence tending to show that they were used in the commission of a crime . . . ." *State v. Miller*, 288 N.C. 582, 592, 220 S.E. 2d 326, 334 (1975). The foregoing evidence clearly tends to show that the pistol admitted was the weapon used to kill decedent. Hence, we hold that it was properly admitted. As in *Miller*, however, "if it be conceded, *arguendo*, that [the pistol] had not been sufficiently identified so as to render its admission erroneous," in view of defendant's statements and other evidence tending to link him to the crime, its admission was harmless beyond a reasonable doubt. 288 N.C. at 592, 220 S.E. 2d at 334.

### EVIDENTIARY RULINGS ON PSYCHIATRIC TESTIMONY

Defendant assigns error to five evidentiary rulings during the testimony of Dr. James Groce, an expert in forensic psychiatry who testified as a witness for defendant.

### I.

[7] Dr. Groce testified regarding the result of an I.Q. test administered to defendant at his direction while defendant was hospitalized for evaluation in connection with this case. The court then disallowed his proffered testimony as to the results of other I.Q. tests previously administered to defendant. Neither the disallowed testimony nor the testimony preceding it indicated when the prior tests were administered. The relevance of these tests to defendant's mental capacity at the time the alleged crime was committed thus was not established, and it was not error to

exclude the proffered testimony. *See* 1 Stansbury's North Carolina Evidence § 77 *et seq.* (Brandis Rev. 1973).

## II.

[8]   The court disallowed Dr. Groce's proffered opinion that when defendant was admitted to the hospital for evaluation, six days after decedent's death and approximately eleven months before trial, he was incapable of standing trial. The issue of a defendant's capacity to stand trial "should be determined prior to the trial . . . for the crime charged in the indictment." *State v. Propst*, 274 N.C. 62, 69, 161 S.E. 2d 560, 566 (1968). It was not properly raised during testimony of the last of nineteen witnesses at trial. Even so, the appropriate issue would have been defendant's capacity to stand trial at the time of trial, not at the time of his hospitalization eleven months earlier. It thus was not error to exclude the proffered testimony.

## III.

[9]   The court disallowed Dr. Groce's proffered testimony as to what defendant had told him regarding his previous hospitalizations "for mentally related problems." It was established on voir dire that these hospitalizations occurred during a period commencing in 1958 and terminating in 1967. While an expert psychiatric witness may recount his out-of-court conversations with a defendant in a criminal trial in order to explain his diagnosis to the jury, *State v. Wade*, 296 N.C. 454, 251 S.E. 2d 407 (1979), such evidence is nevertheless properly excluded if it concerns times too remote to have any relevance to defendant's mental condition at the time of the crime for which he is charged. *State v. Franks*, 300 N.C. 1, 265 S.E. 2d 177 (1980). The evidence in question concerned times too remote to have any relevance to defendant's mental condition at the time of decedent's death. It therefore was not error to exclude it.

## IV.

[10]   Dr. Groce testified that he "would estimate [that] sixty percent, perhaps seventy percent of the population has a neurosis." He was then asked: "Q. So, based on that, there are twelve people on the jury. How many have a neurosis?"

He answered, over objection: "It would be difficult to say without my interviewing them. I would say that if they are

average citizens, a little over half of them." Defendant contends this testimony was "irrelevant and inflammatory." While perhaps it was irrelevant, we do not believe there is a reasonable possibility that a different result would have been reached had this testimony been excluded. Defendant thus has failed to sustain his burden of showing prejudice from its admission. G.S. 15A-1443.

## V.

[11]   The court allowed Dr. Groce to testify on cross examination that "in the general sense" defendant knew the difference between right and wrong. This testimony was relevant and admissible on the issue of whether defendant was legally insane and thereby exempt from criminal responsibility. *See State v. Franks*, 300 N.C. 1, 10, 265 S.E. 2d 177, 182 (1980); *State v. Potter*, 285 N.C. 238, 249, 204 S.E. 2d 649, 656 (1974). There is thus no merit to defendant's assignment of error to its admission.

## MOTIONS TO DISMISS

[12]   Defendant assigns error to the denial of his motions to dismiss. He contends that, without his statements, the evidence was inadequate to sustain the conviction. We have held the statements properly admitted, however; and with the statements in evidence, " 'there is substantial evidence to support a finding both that an offense charged in the bill of indictment has been committed and that defendant committed it.' " *State v. Joyner*, 301 N.C. 18, 27, 269 S.E. 2d 125, 131 (1980), *quoting from State v. Roseman*, 279 N.C. 573, 580, 184 S.E. 2d 289, 294 (1971). The motions to dismiss thus were properly denied.

## INSTRUCTION ON INVOLUNTARY MANSLAUGHTER

[13]   The court instructed on the possible verdict of guilty of involuntary manslaughter as follows:

Involuntary manslaughter is the unintentional killing of a human being by an unlawful act, not amounting to a felony or by an act done in a criminally negligent way.

For you to find the defendant guilty of involuntary manslaughter, the State must prove two things beyond a reasonable doubt. First, that the defendant acted unlawfully and the defendant's act was unlawful if it was an assault with a deadly weapon. An assault with a deadly weapon is the in-

tentional and unjustified pointing of a deadly weapon or a pistol at one by another. And a .22 caliber pistol is a deadly weapon. Second, the State must prove that this unlawful act proximately caused [decedent's] death.

. . . .

[I]f you do not find the defendant guilty of second degree murder or voluntary manslaughter, but the State has proved beyond a reasonable doubt that the defendant did not act in self defense, then you must determine whether the defendant is guilty of involuntary manslaughter. If you find from the evidence beyond a reasonable doubt that . . . [defendant] assaulted [decedent] with a deadly weapon, thereby proximately causing [her] death, it would be your duty to return a verdict of guilty of involuntary manslaughter.

Defendant contends the court erred by failing to explain the meaning of "criminal negligence." The court explained, however, that to find defendant guilty of involuntary manslaughter, the jury must find that defendant's act was unlawful, and that the act was unlawful if it was an assault with a deadly weapon. "An intentional, wilful or wanton violation of a statute or ordinance, designed for the protection of life or limb, which proximately results in injury or death, *is culpable negligence.*" *State v. DeWitt*, 252 N.C. 457, 458, 114 S.E. 2d 100, 101 (1960) (emphasis supplied). G.S. 14-32, which establishes the offense of assault with a deadly weapon, is a statute designed for the protection of life or limb. The court's explanation regarding the unlawful act of assault with a deadly weapon thus included, in substance, a definition of culpable negligence. It therefore, while not a model charge, see N.C.P.I.—Crim. 206.30, sufficed to "explain the law arising on the evidence" in this case. G.S. 15A-1232.

RESULT

We find that defendant had a fair trial free from prejudicial error.

No error.

Judges HEDRICK and HILL concur.